D. L. Fair Tie Co. *v.* Warrell.*

(Division B.    April 11, 1927.)

[112 So. 24.    No. 26368.]

1. COMPROMISE AND SETTLEMENT. *Recovery for breach of contract, based on alleged compromise or modified contract, cannot be had unless compromise contract is established.*

Where right to recover for breach of contract to purchase railroad ties was based on alleged compromise or modified contract, whereby it was agreed that seller should stop producing ties and

buyer would accept ties then on hand in settlement of prior contract, recovery could not be had unless such compromise contract was established by a preponderance of the evidence.

2. COMPROMISE AND SETTLEMENT. *Recovery could not be had on original contract, where right to recover for breach was based on alleged compromise or modified contract.*
Where right to recover for breach of contract for sale of railroad ties was in complaint based on alleged compromise or modified agreement, whereby seller agreed to stop producing ties and buyer agreed to accept ties then on hand, such compromise agreement could not, on the trial, be disregarded and recovery had on establishing original contract.

3. COMPROMISE AND SETTLEMENT. *Compromise or modified contract in settlement of bona-fide dispute as to doubtful claims constitutes binding agreement.*
Where contract for sale of railroad ties was compromised or modified to extent that seller agreed to stop producing ties and buyer agreed to accept ties then on hand, in settlement of *bona-fide* dispute as to doubtful claims existing between parties, compromise or modified contract between the parties constituted a binding agreement.

4. COMPROMISE AND SETTLEMENT. *Settlement of bona-fide dispute as to doubtful claims in good faith is sufficient consideration for compromise agreement.*
The settlement of a *bona-fide* dispute as to doubtful claims between parties, made fairly and in good faith, is a sufficient consideration for compromise agreement based thereon.

5. ESTOPPEL. *Sellers basing right to recover on alleged compromise or modified contract will not be heard to contend there was no consideration therefor.*
Where sellers in bringing action for breach of contract for sale of railroad ties based their right to recover on alleged compromise or modified contract, whereby they agreed to stop producing ties and buyer agreed to accept ties then on hand, they will not be heard·to contend that there was no binding consideration for compromise agreement:

*Corpus Juris-Cyc. References: Compromise and Settlement, 12CJ, p. 324, n. 22; p. 364, n. 20; p. 366, n. 56; Estoppel, 21CJ, p. 1226, n. 37.

APPEAL from circuit court of Choctaw county, Second district.

Hon. T. L. Lamb, Judge.

Action by the D. L. Fair Tie Company, a partnership composed of D. L. Fair and others, against Lon Warrell. Judgment for defendant, and plaintiffs appeal. Affirmed.

*Reporter's Note*: Elaborate briefs, discussing fully the controverted question of fact upon which this case turns, were filed by *J. B. Gully* and *Baskin, Wilbourn & Miller,* for appellants, and *J. Lem Seawright* and *W. W. Magruder,* for appellee.

Argued orally by *R. E. Wilbourn,* for appellant and *J. Lem Seawright,* for appellee.

Anderson, J., delivered the opinion of the court.

Appellants, D. L. Fair Tie Company, a partnership composed of D. L. Fair, Claude Fair, and F. L. Fair, brought this action in the circuit court of Choctaw county against appellee, Lon Warrell, to recover the sum of eight thousand seven hundred eighty dollars and fifteen cents damages claimed to have been suffered by appellants because of an alleged breach by appellee of a contract between appellants and appellee, by the terms of which the latter agreed to purchase from the former forty thousand railroad cross-ties. There was a trial resulting in a jury and verdict and judgment for appellee, from which judgment appellant prosecutes this appeal.

The action was based on an alleged verbal contract between appellants and appellee, by the terms of which appellants sold appellee forty thousand railroad cross-ties, subject to the specifications and inspection of the Atchison, Topeka & Santa Fe Railroad Company, at agreed prices, about which prices there was no controversy. Appellants claimed that there were delivered to and accepted and paid for by appellee on the alleged contract

twenty-six thousand five hundred seventeen ties, leaving a balance due by appellants to appellee under the alleged contract of thirteen thousand four hundred eighty-three ties, which appellants got out and tendered to appellee, and which appellee refused to accept; that these thirteen thousand four hundred eighty-three ties were then sold by appellants for account of appellee and the proceeds thereof credited to the appellee on their purchase price, leaving due by appellee to appellants the amount sued for.

Appellants were engaged in the railroad cross-tie business, with its principal place of business at Louisville in this state. Appellee was also engaged in that business, with its principal office or place of business at Ackerman, in this state. Appellee had a contract with the Atchison, Topeka & Santa Fe Railroad Company, made through the office of that company at Chicago, Ill., by the terms of which the railroad company agreed to take from appellee all the ties produced by him during the first three months of the year 1921. The specifications for the ties were to be furnished by the railroad company, and they were to be accepted subject to inspection of the railroad company. The prices to be paid appellee by the railroad company for the ties were agreed upon. There was no conflict in the evidence as to the terms of the contract in that respect. Appellants alleged in their declaration, and their testimony tended to establish, that soon after the making of that contract between the railroad company and appellee, the latter made a contract with appellants by the terms of which he agreed to take all the ties appellants might produce during the first three months of the year 1921, at ten cents less per tie than appellee was to receive from the railroad company, subject to the specifications and inspection of the railroad company. Appellee's contention was and the testimony in his behalf tended to establish his contention, that under the terms of the contract between appellants and appellee the former were to ship to the railroad company all ties produced by them during the three months'

period referred to above, on appellee's contract with the railroad company, as long as the latter would accept the ties, the ties to be subject to the specifications and inspection of the railroad company, the price to be received by appellants ten cents less per tie than the appellee was receiving from the railroad company; and that the number of ties appellee should purchase from appellants was expressly conditioned upon the number that the railroad company would accept from appellee. Putting it differently, appellants' position was that at the prices agreed upon appellee agreed to take all the ties they could produce during the first three months of 1921, conditioned alone that they should meet the specifications and inspection of the railroad company; while appellee's position was, that he contracted to take at the agreed prices, subject to the specifications and inspection of the railroad company, only such ties as the latter would accept from him under his contract with the railroad company.

Appellants and others from whom appellee had purchased ties proceeded to produce and ship ties to the railroad company under appellee's contract with the railroad company and under their contracts with appellee until the early part of February, 1921, when this condition of affairs came about: The effects of the financial crash of the summer of 1920 was not fully felt until the late winter and early spring of 1921. It seems that so far as the prices of railroad cross-ties were concerned, that the big decline took place in the early part of 1921, perhaps during the months of January and February. The railroad company found that it had on hand something like six million ties, bought, perhaps, at the peak of prices, and, in order to avoid any further loss, determined to breach its contract with appellee by refusing to take from him any more ties. Carrying out that purpose, on the 4th of February, 1921, the company had its Chicago office to telegraph appellee to stop his output of ties at once. Thereupon appellee notified appel-

lants and others, from whom he was purchasing ties to fill his contract with the railroad company, to stop their output of ties. At the time this was done appellee was in Chicago, in the office of the railroad company. When appellee found that the railroad company had determined to breach its contract to take all the ties he could produce during the first three months of 1921, he proceeded to take care of the situation for himself and appellants and others from whom he had purchased ties as best he could under the circumstances. He represented to the railroad company that he and appellants, and others with whom he had contracts for ties with which to file his contract with the railroad company, probably had on hand ready for shipment something like two hundred thousand ties, and insisted that the railroad company accept that many of the ties on hand. This the railroad company agreed to, and the agreement was carried out. After appellee's return from Chicago, and on or about the 15th of February, 1921, there was had a conference in appellee's office in Ackerman between appellee and D. L. Fair, one of the members of appellants' firm. What took place at that meeting between D. L. Fair, representing appellants, and appellee, as we understand, is the crux of this case. D. L. Fair testified for his firm that he readily acquiesced in the situation and agreed to stop producing ties, but that he stated to appellee that he had already produced and had on hand from forty thousand to forty-four thousand ties ready for delivery, which he insisted that appellee ought to accept on his compromise agreement with the railroad company, by which the latter was to take up and receive as much as two hundred thousand ties already produced by appellee himself and appellants and others from whom appellee was purchasing ties, and that appellee agreed to do this, and in pursuance of that agreement there was taken up by appellee and shipped to the railroad company twenty-six thousand five hundred seventy-two of appellants' forty thousand ties. On the other

hand, appellee testified, and he was strongly supported by other witnesses who were present, that appellants agreed, in view of the situation, to stop producing ties, and appellee would accept on his two hundred thousand tie-compromise contract with the railroad company appellants' just proportion of the ties they had already produced. Appellee's evidence tended to show that others than appellants from whom appellee had purchased ties to fill his contract with the railroad company had ties ready for shipment, and it was understood between appellants and appellee that the two hundred thousand ties which the railroad company agreed to accept were to be divided among all of appellee's customers from whom he had bought ties, in proportion to the number of ties each had ready for shipment, and in pursuance thereof appellants shipped to the railroad company twenty-six thousand five hundred seventeen ties. Appellee's evidence further tended to show that that number of ties constituted appellants' just proportion of appellee's two hundred thousand-tie compromise contract with the railroad company. The result was that when the railroad company had received the two hundred thousand ties due under the compromise contract, appellants had left on hand the ties for the price of which they sued.

Appellants contend that the judgment in this case should be reversed because the instructions given appellee were erroneous; and for the further reason that the instructions given for appellants and appellee were in irreconcilable conflict, and therefore furnished no certain guide for the jury. Conceiving that appellants had based their whole right to recover on the alleged compromise or modified contract made in appellee's office at Ackerman on or about the 15th of February, 1921, by the terms of which, according to the testimony of Mr. Fair, it was agreed that appellants stop producing ties and appellee would accept forty thousand of appellants' ties then on hand in settlement of the prior contract, appellee had the court to instruct the jury that they

should return a verdict for appellee, unless such compromise contract had been established by a preponderance of the evidence. On the other hand, at the instance of appellants, the court gave two or more instructions which authorized the jury to disregard entirely such compromise agreement and return a verdict for the appellants, if the jury believed, from the evidence, that in the early part of 1921 the appellee agreed to purchase and accept all the ties produced by appellants during the first three months of that year, and in pursuance thereof appellants produced as much as forty thousand ties meeting the specifications of the railroad company, thirteen thousand four hundred eighty-three of which appellee refused to accept. These instructions for appellants were in conflict, and, we think, irreconcilable conflict, with two or more of the instructions given for appellee. But we are of opinion that appellee's instructions embodied correct principles of law and were applicable to the case made; while appellants' instructions, conflicting therewith, were not applicable to any phase of the case made by appellants' own evidence.

It is true that appellants in all three counts of their declaration give a history of contract between the railroad company and appellee covering the first three months of 1921, and the contract between appellants and appellee covering the same period, and the transactions and dealings between the parties thereunder, and it is also true that much of the evidence was addressed to those subjects; still, by their declaration and by their evidence in support of the declaration, appellants planted their case squarely on the compromise contract as testified to by Mr. Fair, made between appellants and appellee on or about the 15th of February, by the terms of which, according to his testimony, appellee agreed without qualification to take as much as forty thousand of appellants' ties then on hand. And, furthermore, if appellants had declared on the original contract between themselves and appellee in either of the counts in their

declaration, under the undisputed evidence in the case
they would not have been entitled to recover, for these
reasons: In some of the instructions given for appellants
it was assumed as a fact that after the railroad breached
its contract with appellee there was a compromise set-
tlement between appellants and appellee. And, further-
more, Mr. D. L. Fair, one of the appellants, freely ad-
mitted on the evidence stand the making of such com-
promise agreement. There was no conflict whatever
in the evidence on that question. In the course of the
trial of the case that was not an issue; it was accepted
by both sides as a fact. The only issue of fact was,
whether or not appellee agreed to accept from appel-
lants the forty thousand ties they then had on hand
ready for delivery. As stated, appellants' evidence tend-
ed to show that such an agreement was made, while that
on behalf of appellee tended to show the contrary. In
the first place, that agreement, whether it is called a com-
promise agreement or a modification of the original con-
tract between the parties, was a binding agreement. It
was a settlement between the parties of a *bona-fide* dis-
pute as to doubtful claims existing between them, for ap-
pellants were contending that under the original con-
tract between them and appellee, the latter had pledged
himself to accept all the ties appellants might produce
during the first three months of 1921, subject to the speci-
fications and inspection of the railroad company, regard-
less of whether the railroad company would accept the
ties from appellee or not; while appellee was contend-
ing that he had no such contract, that appellee had only
agreed to accept the ties produced by appellants during
that period which the railroad company would accept
from him. These differences were settled, according to
the evidence on behalf of appellants, by the latter agree-
ing to stop producing ties, provided appellee would ac-
cept forty thousand of their ties then on hand; while ac-
cording to the evidence on behalf of appellee, their differ-
ences were settled by appellee agreeing to take as much as

forty thousand of appellants' ties then on hand, provided the railroad company would accept the ties from appellee. The compromise settlement was performed in part according to the undisputed evidence, by appellants delivering on the contract twenty-six thousand five hundred seventeen of the forty thousand ties, when the railroad company refused to accept any more.

There seems to be no division among the authorities that the settlement of a *bona-fide* dispute as to doubtful claims between parties, made fairly and in good faith, is a sufficient consideration for the compromise agreement based thereon, 12 C. J., section 17, p. 324. And, in the second place, appellants will not be heard to contend that there was no binding consideration for the compromise agreement, for, as stated, they elected to stand on it. It was the basis of their action; they relied on it in their declaration and in their evidence as a binding agreement; they will not, therefore, be heard to say that they have a right to stand on the original contract unmodified by the compromise contract.

It follows from these views that the instructions given for appellants authorizing the jury to disregard entirely, in any view they might take of the evidence, the compromise agreement, were erroneous; they were inapplicable to the case made by appellants' declaration and evidence. On the other hand, as stated, appellee's instructions were correct and applicable to appellee's case as made by the evidence.

*Affirmed.*