493 So.2d 301 (1986)
FEDDERS CORPORATION
v.
Ross BOATRIGHT, Jr., and Mary Elizabeth Boatright.
No. 55,475.
Supreme Court of Mississippi.
May 28, 1986.
Rehearing Denied September 17, 1986.
*303 Guy T. Gillespie, III, Holcomb, Dunbar, Connell, Chaffin & Willard, Oxford, for appellant.
T.H. Freeland, III, T.H. Freeland, IV, Freeland & Freeland, Ralph M. Dean, Oxford, for appellee.
Before ROY NOBLE LEE, P.J., and HAWKINS and SULLIVAN, JJ.
HAWKINS, Justice, for the Court:
Fedders Corporation appeals from a judgment in favor of Ross and Mary Elizabeth Boatright in the circuit court of Lafayette County for $3,000 actual and $20,000 punitive damages, and attorney fees of $5,000 plus $310.74 in trial expenses.
We find no error in the award of actual damages, and also the allowance of attorney fees was proper under the Magnuson-Moss Act, 15 U.S.C.A. § 2303 et seq., and affirm the judgment as to these.
This is not a case for punitive damages, however, and the judgment is reversed and rendered as to this item.

FACTS
In 1977 Tommy Skelton constructed a new residence for the Boatrights. On July 11 the Oxford Heating & Cooling Company (OH & CC), a local air conditioning business, installed a Fedders brand heat pump. The Fedders Corporation's principal offices are located in New Jersey.
The complete system for this heat pump consisted of the outdoor condensing unit, the indoor evaporator (blower with coil on inside), and interconnecting tubing and thermostat.
Larry E. Tatum owned and operated OH & CC during the period following the Boatrights occupancy of their home, and this business was the local dealer for Fedders air conditioners.
Thermal Equipment & Sales Corporation (TESCO), a Memphis jobber, was the area distributor for Fedders air conditioners and parts.
Fedders issued a limited warranty with this heat pump carrying the following express obligations:
(1) In event of failure to function the first year due to defect in material or workmanship of any part of the product, Fedders would furnish a new or rebuilt part, with the owner obligated to pay all delivery, installation and labor costs.
(2) In event of failure to function from second through fifth year of purchase date due to defect in material or workmanship of compressor, Fedders would furnish a new or rebuilt compressor, with the owner obligated to pay all delivery, installation or labor costs.
The limited warranty excluded liability caused by improper installation or unreasonable use of the unit, including failure to provide reasonable and necessary maintenance, or to follow written installation and use instructions of the manual.
In bold face type the limited warranty stated it provided the sole and exclusive remedies, no other express warranties were made. Likewise, all implied warranties were limited to one year from date of purchase, and incidental expenses and consequential damages were excluded.[1]
The Boatrights testified the unit began giving them trouble in the summer of 1977. The main trouble with the heat pump occurred, *304 however, in the winter, especially in the severely cold periods, when the outdoor condensing unit would "freeze up."
This case went to trial June 15, 1983. Tatum testified his first record of repairing the unit was November 22, 1977, when he found the outdoor condenser coil frozen with ice. He said it was normal to freeze to a certain extent, but a defrost cycle should then be triggered thawing it out, and enabling the machine to start heating. On December 5, 1977, he found the same problem, and three small leaks. He thought the problem was the indoor coil or the "reversing valve," but neither he nor his employees could locate the precise cause of the problem. They never found the compressor overheated. Tatum contacted TESCO who told him the trouble was in the defrost switch, but he said another switch did not correct the problem. After working on the unit, it would operate for a while only to have the same problem recur.
Tatum had seventeen repair tickets covering the period from July 18, 1978, through April 20, 1980, of his firm's work on the unit, the lowest charge being $23.63 and the highest $59.06 on March 28, 1979, when the defrost timer switch was replaced. The Boatrights were never charged for any of the work done by Tatum's firm. Some time in the latter half of 1981 Tatum telephoned the Consumer Affairs Department of Fedders and reported the problem with the unit.
This model of Fedders heat pumps was having problems nationwide with the defrost cycle switches. The Federal Trade Commission (FTC) made an investigation, following which Fedders entered into a consent order with the Commission on June 14, 1979, whereby Fedders agreed to make available to all customers without charge defrost system service to replace the defrost cycle switches, and to install them without charge. In addition Fedders was required to give an extended full warranty for the replacement through May 1, 1980.
The order required Fedders to mail within ten days after it became final a written notice to each current owner of Fedders the obligations of Fedders thereunder, and to enclose with it a postage pre-paid card for the owner to mail to Fedders. The card was to notify Fedders of the owner's election to have a new switch installed.
The order also provided that failure of an owner to return the card, unless the package was returned to Fedders as undeliverable, should be considered an election by the owner not to have a new switch installed.
A later consent judgment was entered in 1981. The Boatrights testified they never received the notice. However, the notice sent by Fedders to the Boatrights pursuant to the second order was returned to the company, because it was not delivered, and it was mailed to Ralph M. Dean, an Oxford attorney who was then representing the Boatrights in their difficulties with Fedders. Pursuant to the order Fedders mailed 40,000 notices nationwide to customers.
Both Mr. and Mrs. Boatright testified about the problems they had with the heat pump, corroborating Tatum. Because of the inadequate heating the Boatrights purchased and installed a wood stove costing $800, and two kerosene heaters costing $179 each. They also testified their electric bills increased because of this, but no amount was shown.
In March, 1980, the Boatrights read an article in the local newspaper about Fedders heat pumps being defective. This article caused them to consult Dean, who they employed. Defense objection to the published article's introduction into evidence was sustained.
We summarize the exchange of correspondence between Dean and Fedders from April 25, 1980, through November 18, 1981.
1980 CORRESPONDENCE
1. April 25, Dean demands entire replacement cost of unit plus out-of-pocket expenses, including $800 lost for heater and $40 to $50 a month for added heating bills.

*305 2. May 21 Joel Gold, Manager-Consumer Affairs with Fedders, wrote Mr. Boatright that after evaluating the installation "a decision has been made to grant your request for a refund of the purchase price of your split system heat pump." This letter further states the refund covered the cost of equipment only, the retail price of which was $1,451.21. This letter requested Boatright to sign an enclosed release and return with the metal tags to the heat pump units.
3. June 4 Dean wrote Gold enclosing estimated cost of a replacement unit in amount of $2,227.37 and demanded this payment plus additional electrical bills in the amount of $480.
4. July 21 Dean received no replay to his letter, and again wrote Gold demanding payment reminding him of the complaint with the FTC.
5. July 22 Gold wrote Dean that under the terms of the full warranty, the consumer had the right to request a full refund for a free replacement, and Boatright had elected the refund (an error, Boatright had made no such election). The letter requested Boatright to sign the release and return with the metal tags.
6. July 31 Dean wrote Gold insisting on full replacement costs.
7. August 22 Gold wrote Dean their obligation was only to refund original, not current costs.
8. September 12 Dean to Gold, informing him Boatright was interested in investigating the possibility of a replacement unit rather than a cash refund. He wanted information of Fedders' policy regarding replacement units, cost of installation and warranty. He also wanted to know who would service the unit.
9. September 30 Gold to Dean. In lieu of refund Fedders would be willing to install a new outdoor unit at no cost. However, warranty would be from date of original purchase.
10. October 13 Dean to Gold. His client wanted the entire unit replaced, not just the outside unit.
11. November 17 Gold to Dean. Under "full warranty" the customer was entitled to refund of full purchase price of the entire unit. If customer wanted replacement, only the outside unit would be replaced; but if the service man upon inspection found the coil of the indoor blower should be replaced, Fedders would do this also.
12. November 21 Dean to Gold. His client wanted a replacement of the unit rather than cash refund, and also to replace the indoor unit if needed. If Gold would sent the necessary papers, he would have his client sign them. Requested prompt attention from Fedders.
13. December 29 Dean to Paul Kolv, Vice President. Stated he represented Boatright and had first written Fedders on April 25, and had since been negotiating with Gold. Because of total failure of unit, Fedders should either replace the unit with full warranty or refund at replacement cost. Also Mr. Boatright had suffered out-of-pocket expenses. Dean also stated he had been in contact with FTC, and he did not believe Fedders had dealt in a fair and reasonable manner.
1981 CORRESPONDENCE
14. January 20 Peter Palumbo, Manager-Consumer Affairs, to Dean. He stated their records indicated Mr. Boatright requested a refund of purchase price on April 25, 1980 (an erroneous statement), and that request had been granted on November 17. Fedders agreed to refund full purchase price or replace the unit at Fedders expense.
15. February 20 Dean to Palumbo. Stated he was confused by Palumbo's letter, and complained of "foot dragging" by Fedders, and asked for a replacement unit in a few days.
16. May 14 Palumbo to Dean. A search of files failed to produce a release. A *306 release was enclosed for Boatright to sign, and when returned would arrange for immediate installation of the replacement unit.
17. May 18 Dean to Palumbo. Complained release sent was for a cash refund of $1,451.21, and nothing said about a replacement unit. If not forthcoming suit would be filed.
18. June 22 Dean to Palumbo. The release was being sent, but with specific understanding Boatright would get a replacement unit.
19. July 14 Dean to Palumbo. Complaining he could not reach him in returning Palumbo's call to Dean.
20. July 27 Palumbo to Dean. Enclosed copy of June 26, 1981, FTC consent decree notice (the second order), which had been mailed to Boatright and returned. This gave options available to Boatright under the consent decree.[2] This letter requested Dean to review program with Boatright. It also stated Fedders was "processing the refund as per the previous correspondence." However, Mr. Boatright "may have additional benefits under the new program." The letter finally asked him to please allow thirty days for the check.
21. August 19 Palumbo to Boatright at Boatright's home address. This letter enclosed a check for $1,451.21 and apologized for problems.
22. August 26 Dean to Palumbo. Informed him his client elected a replacement, not a refund. He requested a replacement without delay.
23. September 4 Palumbo to Dean. Apologized, stated they had authorized their distributor TESCO to provide Mr. Boatright's service contractor with replacement equipment and have work performed at no charge to Mr. Boatright.
24. November 18 Dean to Palumbo. Demanded replacement within five days, or suit would be filed.
Sometime in November, 1981, Jayne Dini of Fedders, telephoned Max Jenkins of Bruce, an air conditioner dealer, but not of Fedders products, to investigate a change of inside and outside equipment. On December 29, 1981, Jenkins visited the Boatright home and inspected the unit. On March 15, 1982, Jenkins attempted to report to Dini by telephone, but was unable to get her, and she did not return his call.
The Boatrights filed suit on May 18, 1982. Shortly before suit was filed they conveyed their residence.
The jury returned a verdict awarding the Boatrights $3,000 actual and $20,000 punitive damages. The jury was unanimous in awarding actual, and nine-to-three in awarding punitive damages. Following the verdict, the circuit judge acting under 15 U.S.C.A. § 2303 (the Magnuson-Moss Act) awarded the plaintiffs $5,310.74 in attorney's fees.

LAW

FAILURE TO PROVE DEFECT
Fedders claims the Boatrights failed to prove any breach of warranty in that the fault could just as well have been a faulty installation as the product itself. The record clearly reveals what the problem was with this heat pump: it would "freeze up" and quit heating in cold, and especially in below freezing weather. Unfortunately, we will never know from this record what in fact caused the problem. Fedders, in the best position to answer this question  after all it manufactured the heat pump  never saw fit to have any of its factory representatives inspect it and answer the question.
It takes no extra amount of intelligence, however, to fathom that one of the two quite ordinary purposes for which this unit was purchased was to adequately heat the Boatright residence in the winter, and certainly no more cerebratrion to ascertain the unit, for some reason, was unfit for this purpose.
*307 The Boatrights at least proved a breach of an implied warranty of merchantability, about which more will be said later.
There are two answers, then, to Fedders contention. First, the Boatrights having proved a breach of the implied warranty of merchantability, it was the obligation of Fedders to prove it was the dealer's fault, not its own, that the unit was not fit for its ordinary heating purpose. It offered no such proof.
Second, such proof would have been unavailing in any event. Fedders manufactured and placed on the market a machine which required personnel of special skill and knowledge to install. Fedders contracted with and constituted OH & CC as its authorized dealer, the firm in Oxford to sell and install its machines in residences. Fedders represented to the public that OH & CC was its local dealer, and the firm which could install its equipment. OH & CC carried the Fedders sign, presumably, showing it was an authorized dealer. It could even be said that the proper installation of the machine was but a continuation of the manufacturing process, because until finally installed in place the unit had no usefulness.
There is no contention that the Boatrights in any way caused or increased the defect in the unit. The defect could only have been caused by one of two entities: Fedders or OH & CC.
Since manifestly there was a defect for which the Boatrights were blameless, should Fedders be permitted to escape its responsibility under the facts of this case by placing the blame on its dealer? Or, put another way, assuming the fault in the machine's performance arose from faulty installation by OH & CC, rather than at Fedder's manufacturing plant, who should have to pay for such a mistake, Fedders or the Boatrights?
Our answer is that Fedders should bear the burden. Having not only placed a machine which required special skill to install, but the dealer authorized to make such installation, on the market, Fedders should be estopped to deny responsibility for errors committed by its dealer in the installation.
Crocker v. Sears, Roebuck & Co., 346 So.2d 921 (Miss. 1977), cited by Fedders is distinguishable. There is nothing in the record in that case to suggest that the installation of an electric stove, which allegedly was defective and caused a house to catch on fire, required special skill or expertise to install in the house, or further if such were the case, that the defendant had an authorized dealer who made such installations.
We addressed a similar contention to Fedders in Volkswagen of America, Inc. v. Novak, 418 So.2d 801 (Miss. 1982), wherein the defendant manufacturer sought to escape liability under the UCC by claiming that its dealer, not itself, was the "seller." We held that under the facts of that case the manufacturer, as well as the dealer, was a "seller" under Miss. Code Ann. § 75-2-103(1)(d) (1972) because the sale and warranty "blended into a single unit" at the time of sale, and because such sales are usually made, "not only upon the make and model of the automobile, but also upon the assurance of the manufacturer, through its warranty, that the vehicle will conform to the standards of merchantability." P. 804.
Fedders does not seek to escape liability under the claim it was not the "seller," but seeks to require the consumer to prove the problem with the equipment arose solely from its manufacture as opposed to its installation. In Royal Lincoln-Mercury Sales v. Wallace, 415 So.2d 1024, 1028 (Miss. 1982), we held the manufacturer bore responsibility to see that its authorized dealer properly made repairs necessitated by defects covered by its express warranty. It also follows that a manufacturer which puts on the market a machine which requires special skill and knowledge to install before it has any utility whatever is responsible for seeing that its authorized dealer who sold it did in fact properly install the unit. In Royal Lincoln we held that the dealer, insofar as making the repairs *308 of defects covered by warranty of the manufacturer, was the agent of the manufacturer. Here we hold that OH & CC, insofar as installing this machine to a properly operating unit, was likewise agent for Fedders.
This heat pump was not sold directly by Fedders to a consumer, with the consumer having the responsibility for its proper installation, but through an authorized dealer which made the installation.

MEASURE OF DAMAGES
Fedders next claims an improper measure of damages was submitted to the jury. Response to this entails an examination of the code provisions in the entangled negotiations between the Boatrights' attorney and Fedders.
When Dean wrote Fedders on April 25, 1980, there were three possible areas upon which liability could exist.

1. THE FTC JUNE 14, 1979, CONSENT ORDER
This order did not apply, because the Boatrights failed to respond to the notice sent them by Fedders.[3] Moreover, Dean never made demand against Fedders for relief under this order, after corresponding with the FTC himself.

2. THE LIMITED WARRANTY
Under this limited warranty Fedders was obligated to furnish a new or rebuilt part, with the Boatrights to pay delivery, installation and labor costs.

3. IMPLIED WARRANTY OF MERCHANTABILITY
The pertinent portions of Miss. Code Ann. § 75-2-314 (1972) are:
§ 75-2-314. Implied warranty: merchantability; usage of trade.
(1) A warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....
(2) Goods to be merchantable must be at least as such
* * * * * *
(c) are fit for the ordinary purposes for which such goods are used; and
* * * * * *
(3) Other implied warranties may arise from course of dealing or usage of trade.
Fedders' attempt in its express limited warranty to limit its liability as to any implied warranty was invalid. Miss. Code Ann. § 11-7-20 (1972) abolished any requirement of privity to maintain an action against the manufacturer for a defective product, and Fedders was a "seller" within the code definition. See: Volkswagen; Royal Lincoln-Mercury Sales, supra.
Miss. Code Ann. § 11-7-18 (1972) provides:
§ 11-7-18. Limitation of remedies or disclaimer of liability as to certain implied warranties prohibited.
There shall be no limitation of remedies or disclaimer of liability as to any implied warranty of merchantability or fitness for a particular purpose.
This statute is clear and unequivocal as to any attempted limitation on remedies as well as liability for a breach of any implied warranty of merchantability. See also: Miss. Code Ann. § 75-2-719(4) (1972).
Damages for breach of warranty are covered by two sections of the code. Miss. Code Ann. § 75-21-719 states:
§ 75-2-719. Contractual modification or limitation of remedy.
(4) Any limitation or remedies which would deprive the buyer of a remedy to which he may be entitled for breach of an implied warranty of merchantability or fitness for a particular purpose shall be prohibited.
Miss. Code Ann. § 75-2-715 (1972) defines "incidental" and "consequential" *309 damages. Incidental damages are not involved in this case. See: Miss. Code Ann. § 75-2-715(1) (1972). Consequential damages are, and as to these this section states:
§ 75-2-715. Buyer's incidental and consequential damages.
* * * * * *
(2) Consequential damages resulting from the seller's breach include
(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
(b) injury to person or property proximately resulting from any breach of warranty.
Fedders' obligation under its limited warranty was limited to replacement of a defective part.
As we have noted, there was clearly a breach of Fedders' implied warranty of merchantability of this heat pump. Fedders' liability under § 75-2-714 was the difference in actual value of the heat pump at the time it was accepted by the Boatrights and its value if there had been no breach of warranty. See: Massey-Ferguson, Inc. v. Evans, 406 So.2d 15 (Miss. 1981).
If the heat pump could have been repaired so as to properly function, the measure of damages under § 75-2-714 would have been the cost of repairs. See: Smart v. Tidwell Industries, Inc., 668 S.W.2d 605 (Mo. App. 1984); Richardson v. Car Lot, Inc., 10 Ohio Misc.2d 32, 462 N.E.2d 459 (1983); Southern Concrete Products Co. v. Martin, 126 Ga. App. 534, 191 S.E.2d 314 (Ga. 1972); Clark v. International Harvester Co., 99 Idaho 326, 581 P.2d 784 (1978).
If the heat pump could not be repaired and was worthless, the Boatrights under § 75-2-714 would have been entitled to a refund of the purchase price. As stated in Anderson, Uniform Commercial Code, 3rd Ed., Vol. IV, § 2-714:15:
The damage which a buyer recovers for breach of warranty as distinct from incidental and consequential damages, cannot exceed the price of the goods. See also: Ray [Raye] v. Fred Oakley Motors, Inc., (Tex. App.) 646 S.W.2d 288; Warren v. Guttanit, Inc., 69 N.C. App. 103, 317 S.E.2d 5.
Also, as in Massey-Ferguson, supra, this was a proper case for consequential damages suffered by the Boatrights as provided in § 75-2-315. Fedders should have very well have known when selling the heat pump that if it failed to properly heat, the purchaser would seek alternative sources of heat.
Dean's letter of April 25 demanding the replacement cost of the unit exceeded the damages that the Boatrights were entitled under § 75-2-714. Fedders' offer to refund the full purchase price was the maximum amount of damages for which Fedders would have been liable in any event under § 75-2-714. Dean insisted on a replacement cost of $2,227.37 through August, 1980.
Then, Dean wrote on September 12 that his client was interested in a replacement unit rather than a cash refund. Based on this letter Fedders offered to replace the outdoor unit at no cost. There was never any contention by Tatum, the local dealer, that there was any problem except with the outdoor unit, by far the major portion of the completed heat pump. It was therefore not unreasonable for Fedders to decline to replace the entire system, indoors and outdoors. Dean insisted, however, in his letter of October 13 on replacement of the entire unit. Again, Fedders by letter of November 17 offered a refund of the purchase price or to replace the outdoor unit at no cost, and if the indoor unit upon inspection needed replacing Fedders would do this as well. On November 21 Dean accepted this offer.
There was a change in personnel at Fedders resulting in further delay, confusion *310 and outright bumbling, as shown in the correspondence. Again on May 16, 1981, Fedders agreed to replace the unit, and again on June 16 following Dean accepted the offer. In spite of this Fedders mailed a refund check for the full purchase price to Boatright. Thereafter, Fedders again agreed to replace the unit.
There was thus a compromise settlement between the Boatrights and Fedders to replace the unit. In fact, the Boatrights were entitled to a peremptory instruction on liability for the cost of replacing the unit.[4]
When the Boatrights sued Fedders there had been a breach of a binding compromise settlement. In the case of D.L. Fair Tie Co. v. Warrell, 147 Miss. 412, 421, 112 So. 24 (1927), this Court stated:
There seems to be no division among the authorities that the settlement of a bona-fide dispute as to doubtful claims between parties, made fairly and in good faith, is a sufficient consideration for the compromise agreement based thereon... .
The United States Supreme Court in Hennessy v. Bacon, 137 U.S. 78, 11 S.Ct. 17, 34 L.Ed. 605 (1980), stated:
... It is the case of the compromise of a disputed claim, the parties dealing with each other upon terms of perfect equality, holding no relations of trust or confidence to each other, and each having knowledge, or having the opportunity to acquire knowledge, of every fact bearing upon the question of the validity of their respective claims. Cleaveland v. Richardson, 132 U.S. 318, 329 [10 S.Ct. 100, 38 L.Ed. 384] [33:384, 389]. Such a settlement ought not to be overthrown, even if the court should now be of opinion that the party complaining of it surrendered rights that the law, if appealed to, would have sustained... .
Indeed, the Idaho Supreme Court in Wilson v. Bogert, 81 Idaho 535, 347 P.2d 341, 345 (1959), stated: "In an action brought to enforce an agreement of compromise and settlement, made in good faith, the court will not inquire into the merits or validity of the original claim."
When the Boatrights sued there had been a breach of a binding compromise settlement. The undisputed cost of a replacement unit exceeded $2,200. Also, the Boatrights incurred additional expenses exceeding $1,100 purchasing one wood and two kerosene heaters. The jury verdict of $3,000 was not excessive.
Fedders makes no specific complaint as to any of the instructions. We do not address the propriety of the plaintiff's instructions on actual damages. Fedders has not specifically complained as to any such instruction, and the jury manifestly was not misled.

PUNITIVE DAMAGES
Fedders contends this was not a case of punitive damages and the court erred in submitting the issue to the jury.
We do not agree with Fedders that because enforcement of a contract is governed by the UCC it is thereby insulated from any claim for punitive damages. If the breach is of such gross magnitude that it would justify infliction of punitive damages in any contract dispute, it would be strange reasoning to hold that simply because performance of the contract is governed by the UCC there can be no punitive damages. In Bryan Construction Co., Inc. v. Thad Ryan Cadillac, Inc., 300 So.2d 444 (Miss. 1974), cited by Fedders, this Court held that the plaintiff had "elected" his remedies in suing for breach of contract rather than in tort for fraud and deceit. The opinion in a footnote, however, notes the case precedes Miss. Code Ann. § 11-7-36, p. 449, which specifically authorizes such a pleading. We also note it precedes the adoption of the Mississippi Rules of Civil Procedure. Rule 8(e)(2) authorizes *311 pleading alternative or inconsistent claims.
While the UCC makes no attempt to specifically provide for punitive damages, it does note they may be had "by other rules of law." See Miss. Code Ann. § 75-1-106(1); Goetz v. Security Industrial Bank, 508 P.2d 410 (Colo. App. 1973); and Council Bros., Inc. v. Ray Burner Co., 473 F.2d 400 (5th Cir. Fla. 1973). The breach of a contract governed by the UCC, just as the breach of any other contract, in rare instances may be attended by such conduct as to authorize awarding an aggrieved party punitive damages in addition to damages for the contract's breach.
Was this such a breach of contract?
In Seals v. St. Regis Paper Co., 236 So.2d 388 (Miss. 1970), we stated: "Punitive damages may be recovered for a willful and intentional wrong, or for such gross negligence and reckless negligence as is equivalent to such a wrong. (236 So.2d at 392)."
In Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226 (1962), we stated:
In order to warrant the recovery of punitive damages, there must enter into the injury some element of aggression or some coloring of insult, malice or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule. (244 Miss. at 150, 151; 141 So.2d at 233).
And, in Progressive Casualty Insurance Company v. Keys, 317 So.2d 396 (Miss. 1975), we stated:
(b) Punitive damages are not recoverable for the breach of a contract unless such breach is attended by intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort. [Citations omitted] (317 So.2d at 398).
In recent cases we have had occasion to address the propriety of punitive damage suits by policyholders against their insurance carriers.
In Blue Cross and Blue Shield v. Campbell, 466 So.2d 833, 842 (Miss. 1984), this Court stated:
Any plaintiff asking for punitive damages, or any special or extraordinary damages based upon "bad faith" of an insurance company has a heavy burden.
* * * * * *
... In a punitive damages case, it is the responsibility and function of the trial judge, after reviewing all the evidence, to first determine whether the facts of that particular case justify submitting to the jury the issue of such punitive or special damages. In such a case the trial court is not guided by the simple rules of Paymaster, considering only one side's evidence, but rather must consider all the evidence and determine if the defendant's conduct was such that the jury should be called upon in turn to decide the justification and amount of punitive damages, or some extraordinary damages.
The decision of a trial judge whether to submit a punitive damage issue to the jury must come from life's experiences, it cannot come from any precise formula. Indeed, in Blue Cross and Blue Shield v. Campbell, supra, and in Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254 (Miss. 1985), we specifically eschewed the talismatic test that if the plaintiff was entitled to a peremptory instruction he would always be entitled to a punitive damage instruction, or if the peremptory instruction were properly refused, he would never be entitled to a punitive damage instruction. In doing so we followed Reserve Life Ins. Co., v. McGee, 444 So.2d 803 (Miss. 1983), in which punitive damages were allowed even though the liability issue was also submitted to the jury.
We have, however, in these recent cases been able to illustrate some behavior which justifies infliction of exemplary damages.
In Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1978), we condemned an insurance carrier's refusal to pay a valid claim without any arguable reason for such denial. Until that case, *312 such conduct would permit an insurance carrier, in a far better bargaining position than its insured claimants, to simply refuse to pay a claim in the hope of getting it reduced or having the claimant forget it altogether. See also, Reserve Life Ins. Co. v. McGee, supra.
Travelers Indemnity Company v. Wetherbee, 368 So.2d 829 (Miss. 1979), was a variation of the conduct condemned in Veal, supra. There the insured had a fire claim for loss of his dwelling and contents. The claim was clearly divisible but the insurance carrier refused to pay the contents claim, the amount of which was undisputed, until it settled with the insured on the dwelling. Until that case was decided, an insurance company could, and many in fact did, withhold payment of a perfectly proper and valid claim until settlement was made with the insured on the disputed claim.
In Bankers Life & Casualty Co. v. Crenshaw, supra, there was a denial of a meritorious claim with virtually no investigation as to its merits, coupled with disingenuous, deceptive conduct by the insurance carrier in dealing with the insured.
In National Life & Accident Insurance Co. v. Miller, Cause No. 55,702 (decided November 13, 1985, and not yet reported), we condemned a practice of selling health and accident insurance policies in which the commission agents filled the application form, and then denying the claims based upon false answers made by an agent, not the insured.
None of these cases supports a punitive damage instruction in this case. There was no denial of a valid complaint by Fedders; there was no proof of any chicanery on the part of this company. There was no proof of any deliberative pattern by Fedders to frustrate complaints made for defective merchandise. There was incredible incompetence or understaffing of the consumer complaint department of Fedders, or both.
There was ample cause for exasperation, but this in and of itself is not necessarily outrageous conduct. Moreover, the initial delay in making a settlement was caused at least in part by Dean's demanding more than the Boatrights were entitled to under the code. See also: Bellefonte Ins. Co. v. Griffin, 358 So.2d 387 (Miss. 1978).
This was not a punitive damage case, and the circuit judge erred in submitting the issue to the jury.

ATTORNEY'S FEES
The Magnuson-Moss Act, 15 U.S.C. § 2303 et seq., provides for the awarding of attorney's fees to a consumer who prevails in a breach of warranty action.
Section 15 U.S.C. § 2310(d)(2) reads as follows:
(2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.
This case falls squarely under this provision and in fact it is hard to imagine a case that better exemplifies the type of litigation Congress had in mind when drafting this provision.
The trial court correctly held Fedders liable for attorney's fees.
AFFIRMED AS TO ACTUAL DAMAGES AND ATTORNEY'S FEES; REVERSED AND RENDERED AS TO PUNITIVE DAMAGES.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
ROBERTSON, J., not participating.
NOTES
[1] Significantly, the limited warranty also made note that in some states the limitations on implied warranty as well as on consequential damages were not permitted.
[2] It appears this second consent decree gave several options to the owner of a defective heat pump. He could be reimbursed for repairs which had been made, he could request a refund of purchase price, or he could demand a replacement of the unit.
[3] The Boatrights denied receiving any notice from Fedders. The order did not require actual receipt of the notice, however, only that Fedders send the package and not have it returned as undeliverable. There was no evidence that this package was returned.
[4] The Boatrights did not cross-appeal the circuit judge's refusal to grant them a peremptory instruction on liability.