# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-60298

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2018

Lyle W. Cayce
Clerk

STEEL DYNAMICS COLUMBUS, L.L.C.,

Plaintiff - Appellant Cross-Appellee

v.

ALTECH ENVIRONMENT USA CORPORATION,

Defendant - Appellee Cross-Appellant

Appeals from the United States District Court
for the Northern District of Mississippi
USDC No. 1:14-CV-124

Before REAVLEY, JONES, and GRAVES, Circuit Judges.

PER CURIAM:*

This case is about a buyer's burden to prove damages under Mississippi's enactment of the Uniform Commercial Code. Steel Dynamics Columbus, L.L.C., purchased two pollution monitoring systems from Altech Environment USA Corp. The systems did not function as expected and Steel sued.

After a bench trial, the district court found that Altech breached its express warranty to Steel. The district court awarded some incidental damages

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

but also found that Steel failed to prove its direct damages and attorneys' fees. Steel appealed the denial of its direct damages and attorneys' fees. Altech cross-appealed Steel's award of incidental damages, arguing the district court should have enforced a contractual limitation on their recovery. We affirm.

## I.    BACKGROUND

As its name implies, Steel operates a steel mill in Columbus, Mississippi. The plant is regulated by the Mississippi Department of Environmental Quality (MDEQ). The MDEQ issued Steel a "Title V" permit under the Clean Air Act. 42 U.S.C. § 7401 *et seq*. To comply with the permit, Steel contracted with Altech for the purchase and installation of two continuous emissions monitoring systems, or "CEMS." The two systems cost $447,610.20.

Three provisions of the parties' contract are relevant on appeal. First, Altech warranted the CEMS "shall be of good quality and free from defects, latent and patent, in design, materials and workmanship; [and] . . . shall be suitable and sufficient for their specified purpose." Before trial, the parties stipulated that Altech "understood that [Steel] intended to use the CEMS units to monitor emissions in compliance with the Title V permit." Second, the contract provided, "If [Altech] breaches its warranty . . . [Altech] shall, at its option, repair and/or replace . . . any of the Goods which breach this Warranty." The "exclusive" remedy for breach of warranty was repair or replacement. Third, the contract limited damages: "[I]n no event shall [Altech] be liable for special, indirect, incidental, consequential, or punitive damages whether attributable to contract, warranty, tort (including negligence), strict liability or otherwise."

Altech installed the units in January and July of 2011, but they never functioned properly. In June of 2013, the MDEQ issued Steel a Notice of Violation (NOV) for both the inadequate CEMS and the failure to report malfunctions. Following the NOV, Steel self-reported 11 other violations, and

No. 17-60298

the MDEQ assessed a fine of $135,000. With the existing CEMS still unable to function properly, Steel contracted with a third party to install a different CEMS. Steel received over $23,000 in credit from the third party for equipment initially provided by Altech.

Steel sued Altech for breach of express warranty (among other things) and sought damages for: (1) the full purchase price of the Altech CEMS (direct damages); (2) incidental costs sunk while trying to fix the Altech CEMS (incidental damages); (3) the $135,000 fine; and (4) attorneys' fees incurred in dealing with environmental regulatory issues (consequential damages).[1] Following a three-day bench trial, the district court found that the "recurrent malfunctions" of Altech's CEMS rendered them "unsuitable and insufficient for the specified purpose," in breach of the contract's express warranty. The district court found, however, that Steel could not recover its direct damages because it failed to prove the value of the CEMS as received. Further, the district court denied Steel its attorneys' fees, finding that Steel failed to attribute its fees or the fine to Altech's breach. Ultimately, the court awarded Steel $83,320.27 in incidental damages for Steel's efforts to fix the CEMS.

Steel appealed only from the district court's denial of direct damages (the purchase price) and attorneys' fees. Altech cross-appealed, arguing that the district court should have enforced the contract's limitation on consequential and incidental damages.[2]

## II.    DISCUSSION

### A. Standard of Review

---

[1] Importantly, Steel did not seek attorneys' fees under a fee-shifting statute. Instead, Steel characterized its fees as consequential damages.

[2] Altech also asserts two conditional issues in its cross-appeal. Because we affirm the district court's judgment, we do not address those conditional issues.

3

Following a bench trial, "findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005). "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony." *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009).

## B. The Purchase Price

The general measure of damages for breach of warranty is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." MISS. CODE ANN. § 75-2-714(2). This requires proof of the value as warranted and as accepted. *See* § 75-2-714(2). The burden of proof is on the buyer seeking damages. *Gast v. Rogers-Dingus Chevrolet*, 585 So. 2d 725, 731 (Miss. 1991) ("This burden cannot be met by mere conjecture or inferences unsupported by adequate evidence.").

The district court found that it was "far from clear that the CEMS were worthless." However, Steel asserts that it proved the CEMS were worthless as accepted because they were unrepairable. Steel relies on *Fedders Corp. v. Boatright*, 493 So. 2d 301 (Miss. 1986), to argue that, under Mississippi law, proof that a good is unrepairable constitutes proof of worthlessness at the time of acceptance. Such an argument is contrary to the language of *Fedders*.

*Fedders* dealt with a broken heating system. *Id.* at 303. There, the court stated, "If the heat pump could not be repaired and was worthless, the [plaintiff] under § 75-2-714 would have been entitled to a refund of the purchase price." *Id.* at 309. Contrary to Steel's assertion, "could not be repaired *and* was worthless" is not the same as "the goods were worthless *because* they could not be repaired." (emphasis added). While it is true that an unrepairable

good may also be worthless, it does not follow that such a good is always worthless. Mississippi law makes clear just who bears the burden to prove worthlessness.

In *Gast v. Rogers-Dingus Chevrolet*, 585 So. 2d 725 (Miss. 1991), the Supreme Court of Mississippi required a buyer to show proof of the value of the goods as accepted, especially where the buyer retained some value. The Gasts purchased a car that required constant repairs and even caught fire. *Id.* at 727–28. After trying to trade in the car, the Gasts gave it to the bank—which reduced their outstanding loan. *Id.* at 727.

The Gasts sued the dealer for breach of an implied warranty. *Id.* at 727. The jury awarded damages, but the trial court set aside the award for, among other things, failure to prove damages. *Id.* On appeal, the Gasts argued "evidence establishing the purchase price paid for the vehicle, and inferences from the evidence . . . support[ed] their theory that the defective vehicle was essentially valueless." *Id.* 730–31. The Supreme Court of Mississippi found the approach "flawed," explaining:

> The [buyer] offered no evidence to show either the amount received by the bank from the sale of the vehicle and applied for the benefit of the [buyer] to their note, or the value of the vehicle at the time of its sale. This is not sufficient to support an award of damages under § 75-2-714.

*Id.* at 730. Thus, a buyer must prove the value as accepted and cannot do so by relying on "inferences from the evidence" that the good is "essentially valueless." *See id.* ("Having failed to submit requisite proof of damages, no recovery was permissible under 75-2-714.").

Here, the district court found Steel did not prove that the CEMS were worthless at the time of acceptance. A review of the record supports this finding. In fact, the evidence shows Steel retained at least some value from the CEMS. Bryan Vogel, one of Steel's engineers, testified Steel received $23,340

in credit for components of the Altech CEMS. Thus, an award of the full purchase price would not only relieve Steel of its burden, but would result in its unjust enrichment to the tune of at least $23,340. A buyer cannot meet its burden by only proving half of the equation; the value of the good as accepted must also be proven. *See Gast*, 585 So. 2d at 731. The district court did not err by denying Steel its purchase price.

## C. Damages Limitation

On cross-appeal Altech asserts the district court erred by not enforcing a contractual limitation on incidental damages. Because the damage limitation, if enforceable, would foreclose Steel's recovery of attorneys' fees, we address it before discussing the fees.

Section 75-2-719 allows for the limitation of damages. MISS. CODE ANN. §§ 75-2-719(1–4). But at the same time, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code." MISS. CODE ANN. §§ 75-2-719(2). As the comment to section 75-2-719 explains, "[W]here an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value  of the bargain, it must give way to the general remedy provisions in this Article." MISS. CODE. ANN § 75-2-719 cmt. 1. In turn, the Supreme Court of Mississippi has declined to enforce a damage limitation when an exclusive repair or replace warranty fails of its essential purpose. *Massey-Ferguson, Inc. v. Evans*, 406 So. 2d 15, 19 (Miss. 1981) ("[S]uch limitation of damages as allowed under section 75-2-719 presupposes that the warrantor has fulfilled his warranty.").[3]

---

[3] Both parties point to contrasting cases applying same or similar provisions from other states. *See Reynolds Metal Co. v. Westinghouse Elec. Corp.*, 758 F.2d 1073 (5th. Cir. 1985) (applying Texas law); *Riley v. Ford Motor Co.*, 442 F. 2d 670 (5th Cir. 1971) (applying Alabama law). Because *Massey-Ferguson* interprets Mississippi law, it controls. *See also Royal Lincoln-Mercury Sales, Inc. v. Wallace*, 415 So. 2d 1024, 1028 (Miss. 1982) ("Such

No. 17-60298

Here, Altech provided an exclusive repair or replace warranty. The warranty failed of its essential purpose when Altech—over the course of years—was continually unable to repair the CEMS. Thus, the district court did not err in holding the limitation on consequential and incidental damages also failed. *See Massey-Ferguson*, 406 So. 2d at 19–20 (affirming recovery of consequential damages despite contractual exclusion).

## D. Attorneys' Fees

Steel appeals the district court's denial of its $172,704.97 in attorneys' fees. Steel asserts the fees are consequential damages incurred to address "environmental regulatory issues and the MDEQ fine caused by the defective Altech CEMS units." The district court concluded that because the MDEQ fine could have been the result of Steel's reporting violations, attorneys' fees incurred dealing with the MDEQ could not be traced to Altech's breach.

Damages must be reasonably certain. *See Frierson v. Delta Outdoor, Inc.*, 794 So. 2d 220, 225 (Miss. 2001) ("[D]amages may only be recovered when the evidence presented at trial 'removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty.'" (quoting *Wall v. Swilley*, 562 So. 2d 1252, 1256 (Miss. 1990))). A party seeking to recover damages for breach of contract must "trace them directly to the breach of the contract and make them definite enough to comply with the governing rules of law." *Ammons v. Wilson & Co.*, 170 So. 227, 229 (Miss. 1936).

---

repair and replacement warranty provides confidence and assurance to the buyer that he will secure goods conforming to the contract, and a limitation of liability to the seller. If it fails, however, as a remedy in its essential purpose, then its function as a limitation of liability also fails.").

### 1. Trial Testimony

Steel's corporate representative, Anna Chappell, testified that, "[Steel] engaged a law firm . . . to help us navigate the violation, the penalties, *and the subsequent agreed order.*" (emphasis added). Chappell posited that the fees "were incurred as a direct result of the issue [of the] Notice of Violation that was a result of the CEMS not functioning properly." However, she admitted that the fines assessed by the MDEQ and the agreed order were not entirely related to the CEMS. In fact, the agreed order contained several reporting violations committed by Steel.

Michael Caples, one of Steel's attorneys, testified, "[T]he tasks that are part of [the billing records] are totally related to the CEMS unit and the nonoperating Notice of Violation of the CEMS unit." He also testified that Steel self-reported multiple violations to the MDEQ.[4]

### 2. Billing Records

Steel argues that any entries not directly related to the CEMS were deducted from the $172,704.97 in fees it sought to recover. Further, Steel says the district court ignored "Steel's unchallenged, unrebutted testimony and evidence at trial that Steel meticulously subtracted from its invoices any attorneys' fees and costs unrelated to the CEMS units." Steel's argument misses the point. The issue is not whether the fees are "related to" the CEMS or the NOV. The issue is whether the fees resulted from Altech's breach. *See* MISS. CODE ANN. § 75-2-714(1) (stating a buyer may recover damages for the loss "resulting in the ordinary course of events *from the seller's breach*")

---

[4] Caples was not designated as an expert and the district court disregarded his testimony that the MDEQ did not consider the self-reported violations in choosing the fine amount. Steel did not appeal the ruling.

(emphasis added); § 75-2-715(2) ("[C]onsequential damages *resulting from the seller's breach* include . . . .") (emphasis added).

A review of the record does not show that Steel's attorneys' fees resulted from Altech's breach. For example, over 30 hours relate to Steel's "response" to the MDEQ's NOV—of which a large portion is devoted to Steel self-reporting its own violations. Further, there is an entry of 5.4 hours for "Review of stack testing data and information provided by A. Gurley as relates to NOV *and other potential violations*." (emphasis added). The bills also contain multiple entries related to the agreed order, which Steel (through Chappell) admitted was not wholly related to the CEMS.[5]

Confronted with Caples's testimony, Chappell's admission about the agreed order, and billing entries unrelated to Altech's breach, the district court was free to assign more weight to the entries and Chappell's admission. Thus, the district court's finding—that Altech did not prove with reasonable certainty the fees resulted from Altech's breach—is supported by the evidence. The district court did not commit clear error in denying recovery of Altech's attorneys' fees.

Judgment AFFIRMED.

---

[5] Examples of entries related to the agreed order include: (1) "01/22/14 GCR . . . conference with Chris Wells (MDEQ) re: disclosure of noncompliance issue related to non-reporting of September stack test and request of conference with MDEQ *to work on issues associated with Agreed Order*;" (2) "04/04/14 GCR . . . conference with Wells re: revision to *Agreed Order*;" and (3) "04/10/14 GCR . . . begin drafting SEP proposal and revisions to draft *Agreed Order*." (emphasis added).