509 So.2d 886 (1987)
SOUTH CENTRAL BELL, A CORP., Pat Santucci & Mrs. V. Marchetti
v.
Nancy EPPS.
No. 55870.
Supreme Court of Mississippi.
June 3, 1987.
*888 George H. Butler, Phineas Stevens, Lawrence J. Franck, W. Scott Welch, III, John C. Henegan, Butler, Snow, O'Mara, Stevens & Cannada, A.S. Povall, Jr., Jackson, for appellants.
James E. Upshaw, Glenn F. Beckham, Upshaw, Williams, Biggers, Page & Kruger, Greenwood, for appellee.
Before WALKER, C.J., and SULLIVAN and ANDERSON, JJ.
SULLIVAN, Justice, for the Court:

I.
Once again this Court is asked to decide what is seemingly a never ending question: Is this case appropriate for the imposition of punitive damages? This question is brought to us today in a case involving an alleged wrongful disconnection of telephone services. Nancy Epps filed suit in the Circuit Court of Holmes County alleging that South Central Bell wrongfully terminated her telephone services causing her to suffer extreme mental anguish and other pain which necessitated hospitalization. She further alleged that Bell's conduct was willful, wanton, reckless, and intentional so as to demonstrate a disregard for her rights as a subscriber. She sought to recover both compensatory and punitive damages. South Central Bell denied liability arguing that its agents, Pat Santucci and Vivian Marchetti, acted lawfully and in accordance with the General Subscribers' Services Tariff in terminating Epps' telephone service.
At trial, the jury found in favor of Epps and awarded her $75,000.00 in compensatory damages and $3,000,000.00 in punitive damages. From this decision, South Central Bell and its agents appeal and assign the following as error:
I. The Court erred in denying the appellants' Motion for a Directed Verdict at the conclusion of plaintiff's case and in refusing to grant defendants a peremptory instruction;
II. The lower court erred in holding that the defendants were liable for punitive damages and in admitting evidence of the financial worth of the defendants;
III. The lower court erred in submitting the issue of punitive damages to the jury;
IV. The verdict is the result of bias, passion and prejudice, and improper conduct and prejudicial statements by plaintiff's attorneys inflamed the bias, passions, and prejudices of the jury;
V. The award of punitive damages violates the federal and state constitutions;
VI. The award of punitive damages is grossly excessive and should be set aside;
VII. The award of compensatory damages is grossly excessive and should be set aside;
VIII. The court erred in its instructions to the jury, particularly in granting Instruction No. 5 requested by plaintiff;
IX. The court erred in entering judgment for the plaintiff and against the defendants;
X. The verdict and judgment are contrary to the overwhelming weight of the credible evidence; and
XI. The court erred in denying defendants' Motion for Judgment Notwithstanding the Verdict, or, in the alternative, for a New Trial.
For the reasons set forth below, we reverse the award of punitive damages and affirm the award of actual damages.

*889 II.
Nancy Epps, a 79 year old widow, lived alone in her rural home in Mileston, Mississippi. Prior to November, 1980, Mrs. Epps had been a ten year subscriber to South Central Bell for telephone services and had achieved a class "A" credit rating. In November 1980, Mrs. Epps left her home due to illness. Between November and December of 1980, Mrs. Epps' grandson and son charged a number of phone calls to her phone and eventually ran up a bill between $700.00 and $800.00. The bill was left unpaid and her phone services were disconnected in 1981.
In March 1981, Mrs. Epps and her daughter, Dr. Fannie Love, applied for reconnection of her telephone services at the Bell office in Greenwood, Mississippi. Theresa Bates, the business supervisor of the Greenwood Office, testified that at this meeting she agreed to waive a reconnection deposit after Mrs. Epps and Dr. Love explained the recent health problems that Mrs. Epps had suffered from and because Mrs. Epps had been a long standing customer with a good credit reputation. However, Bates readjusted Mrs. Epps credit rating to a "C" because of the excessive bill and because the bill had been left unpaid for nearly three months. Additionally, a $75.00 toll credit limit was placed on Mrs. Epps as a means from preventing her bill from becoming excessively high in the future. Finally, Dr. Love's Memphis telephone number was recorded on Mrs. Epps' account as a contact number in the event any additional problems should arise in the future. The phone was reconnected the next day.
From March 1981, until April 1982, Mrs. Epps received continuous phone service. However, the record indicates that her long distance bill exceeded her toll credit limit almost every month and that at least three denial of service notices were sent to her. Nevertheless, Mrs. Epps consistently paid her bill in full and her phone remained in service.
The critical period in this case began in April 1982. Mrs. Epps received a letter from South Central Bell dated April 6, 1982, which informed her that a deposit of $515.00 was due by April 13, 1982, in order to continue the phone services to her residence. The letter was sent by the defendant Marchetti, the service representative for the account. Marchetti testified that the deposit was required due to Epps' extremely high bills in the previous three months. She further testified that the letter was entered in Bell's computer system under Epps' account.
Thereafter, Mrs. Epps contacted Bell and arranged to pay the deposit in monthly installments of $100.00 per month. Mrs. Epps then received another letter dated April 20, 1982, which informed her that if she paid her phone bills on or before the due date, no deposit would be necessary to continue her services. Again, this letter was sent by Marchetti. Marchetti testified the second letter was known as a "mailed warning deposit letter No. 1" and that the two letters were sent out in the wrong sequence and by mistake. Marchetti also testified that this letter was also entered into Bell's computer system under Mrs. Epps' account.
Subsequently, Mrs. Epps paid her bill on May 3, 1982, three days before the due date. This information was entered into Bell's computer on May 6, 1982. However, without any additional notice, Mrs. Epps' phone service was disconnected on May 9, 1982. The decision to disconnect the phone was made by Marchetti. Bell officials testified that the phone services were disconnected because Mrs. Epps failed to pay the agreed upon deposit installment.
The following day Mrs. Epps contacted her daughter, Dr. Love, and explained the situation. Thereafter, Dr. Love called South Central Bell's office in Greenwood. An unidentified representative explained that the phone was cut off because the deposit had not been paid with the bill. They also denied any knowledge of the April 20 letter. Dr. Love then asked to speak to a supervisor and spoke with defendant Pat Santucci.
There is conflicting testimony at this point as to the content of the conversation between Dr. Love and Santucci. Dr. Love *890 testified that Santucci told her that the phone was disconnected due to Mrs. Epps' failure to pay the deposit and that she denied any knowledge of the April 20 letter. Further she said that Santucci told her that the entire deposit was required before the phone could be reconnected because Mrs. Epps was elderly and could possibly die leaving the phone company stuck with the bill. Santucci denied making any such reference to Mrs. Epps' age or health and denied that Dr. Love ever mentioned the April 20th letter. Further she testified that she did offer to split the deposit in half but Dr. Love refused her offer.
Following the conversation with Santucci, Dr. Love called Don Barrett, an attorney in Lexington, Mississippi. Mr. Barrett testified that he too spoke with Santucci and she told him the high deposit was required due to Mrs. Epps' age and health. Further, Barrett testified that he assured Santucci that the bill would be paid by some member of the family and that she agreed to reduce the deposit to $400.00 after he told her that Mrs. Epps owned a considerable amount of property in the county. He added that Santucci agreed to reconnect the phone immediately if a $200.00 down payment was deposited immediately. Barrett then informed Dr. Love about the agreement.
Santucci testified that she did in fact reduce the deposit and agreed to immediate reconnection with a deposit of $200.00. However, she denied making any statements concerning the age and health of Mrs. Epps. She stated that Barrett made the only statements regarding her age and health.
Subsequently, Mrs. Epps paid the $200.00 down payment on May 12, 1982. Her phone was reconnected on May 13 or 14 and no additional deposit was requested by South Central Bell. However, Mrs. Epps was hospitalized on May 13, 1982. Dr. Johnny Bills testified that she was admitted to the hospital because of an acute anxiety reaction, secondary to harassment from the telephone company. She was treated for a variety of illnesses including chest pains, headaches, bronchitis, elevated blood pressure and syncope (blackouts). Additionally, while in the hospital, Mrs. Epps developed a condition of involuntary voiding of her urine and that condition continued after her release from the hospital. She spent seven (7) days in the hospital. At trial, the trial judge concluded that Mrs. Epps had presented sufficient evidence to create a prima facie case warranting submitting the issue of punitive damages to the jury. He allowed evidence concerning South Central Bell's net worth to be presented to the jury and the jury ultimately returned a verdict in favor of Mrs. Epps.

III.

IS THIS CASE APPROPRIATE FOR PUNITIVE DAMAGES?
The core issue, as we see it, is whether the actions taken by South Central Bell warrant the imposition of punitive damages. However, before resolving this issue, it is imperative that we first define the relationship between the parties, which in turn will help us determine the nature of Mrs. Epps' claim.

1.

SOUTH CENTRAL BELL AND ITS SUBSCRIBERS: CONTRACTUAL RELATIONSHIP GOVERNED BY THE APPROVED TARIFFS.
Telephone Companies are characterized as "public service corporations" or "public utilities" obligated to render their services and extend their facilities to all members of the public in a non-discriminatory manner. See 74 Am.Jur.2d, Telecommunications § 4, § 52 (1974) (discussing the nature and duties of telephone companies). Traditionally, telephone companies have made rules and regulations for conducting their business. Such regulations necessarily include rules concerning payment for services, prepaid deposits as a prerequisite to continued services, and regulations involving the termination of services where a subscriber fails to comply with company rules and regulations. Southwestern Telegraph & Telephone Co. v. Danaher, 238 U.S. 482, 489, 35 S.Ct. 886, *891 888, 59 L.Ed. 1419 (1915); Cosepelich v. Miss. Power Co., 164 Miss. 88, 144 So. 38 (1932) (citing Danaher).
Additionally, telephone companies retain exclusive control over the service they provide to the public. As such, they hold a superior position in their dealings with the public. In an effort to regulate and supervise the business activities of all public utilities, the Mississippi Legislature created the Mississippi Public Service Commission. See Miss.Code.Ann. § 77-3-5 (1972) (designating the scope and power of the Mississippi Public Service Commission). This agency acts on behalf of the public in regulating utilities. By statute, telephone companies still retain the right to make rules and regulations concerning the operation of their business. However, these rules, or tariffs, must be submitted and approved by the Public Service Commission before they are valid and binding on the subscribers. See Miss. Code Ann. § 77-3-33(2) (1972).
The significance of these tariffs with regard to relationship between a subscriber and a telephone company has yet to be directly addressed by this Court. However, we hold today that once such tariffs are approved by the Public Service Commission, they are to be considered part of the service contract between the telephone company and the subscriber. We find support for this proposition in cases handed down by some of our sister states. See Angelo Pavone Enterp. v. So. Cent. Bell Tele., 459 So.2d 1223, 1225-1226 (La. App. 4th Cir.1984), (tariff to be viewed as a contract between telephone company and subscriber); State Farm Fir. & Cas. Co. v. Southern Bell Tel. & Tel. Co., 245 Ga. 5, 262 S.E.2d 895 (1979), (same); Price v. South Central Bell, 294 Ala. 144, 313 So.2d 184, 186 (1975), (tariffs constitute part of subscriber's contract).
Additionally, the United States District Court for the Southern District of Mississippi was recently asked to determine the effect of regulations submitted by South Central Bell and approved by the Mississippi Public Service Commission. Burris v. South Central Bell Tel. Co., 540 F. Supp. 905 (S.D.Miss. 1982). In Burris, the court held that, by statute, once such regulations were approved by the Public Service Commission, they constituted the guidelines as to what Bell could or could not do in providing their services to the public and in conducting their business. Burris, 540 F. Supp. at 908. See also, Miss. Code Ann., §§ 77-3-1, 77-3-45 (1972) (statutes interpreted in Burris). This interpretation is consistent with our existing statutory law and with our holding today.
Accordingly, we find that the relationship between South Central Bell and its subscribers is essentially a contractual relationship. The terms of such a contract are supplied by the tariffs which have been duly filed and approved by the Mississippi Public Service Commission. From this, it logically follows that any claim alleging wrongful disconnection of telephone services must necessarily involve a breach of the subscriber's tariff or contract.

2.

DID SOUTH CENTRAL BELL BREACH THE SUBSCRIBER'S TARIFF?
Turning to the case at hand, we find that South Central Bell did breach the subscribers' contract when it disconnected Mrs. Epps' telephone services. Initially Bell was justified in requiring Mrs. Epps to post the deposit in order to continue her phone services. The tariff authorized Bell to require deposits where subscribers' credit standing had become so impaired so as to create a potential risk of loss in company revenue. Clearly, the Epps' account created such a risk. The account was a "C" credit account without a deposit. The long distance charges consistently exceeded the toll credit limit and three denial of service notices had been issued on the account. Under these circumstances, we believe the account indicated a "potential risk loss" under the tariffs and the company policy which justified Bell's initial demand for deposit. Further, we note that the amount of the deposit required by Bell was consistent with the approved method of determining such deposit and was not unreasonable as the complainants contend.
*892 However, Bell subsequently notified Mrs. Epps by letter that the deposit would not be required provided she paid her bills on or before the due date. At this point, Bell waived the initial deposit requirement. As noted earlier, Bell retained the power to create and enforce their rules concerning their business practices and procedures. Clearly, they also retain the power to waive such rules, at their option, either expressly or by implication. There can be no question that the April 20 letter constituted a waiver of the deposit. The language unequivocally stated that no deposit would be due if the bill was paid on or before the due date. Bell's own employee, Marchetti, admitted that such letters were generally interpreted to mean that no deposit was required for continued services. Once such a regulation or rule is waived, non-compliance by subscriber will not serve as a defense to a claim of wrongful disconnection by that subscriber. See 74 Am.Jur.2d, Telecommunications, § 14 (1974).
Additionally, we cannot say that Mrs. Epps unreasonably relied on the April 20th letter. Subscribers rely solely on communications sent to them from Bell in regard to their telephone services. Mrs. Epps herself, had received notices before and had complied with each without incident. Even though she had previously made arrangements to pay the deposit, there is no evidence to indicate that Mrs. Epps relied on the letter unreasonably, especially in light of her past experiences with South Central Bell.
Having waived the deposit, Bell's disconnection of Epps' telephone for failure to pay a deposit constituted a breach of the subscribers' tariff. There was no deposit to be paid. Mrs. Epps paid her bill in full prior to the due date and was entitled to continued services. Bell's claim that their decision to disconnect was justified because there was no record of the letters is unacceptable. The record shows that such letters are routinely recorded in Bell's computer. Marchetti testified that she in fact entered the letters in question under the Epps' account. We cannot see how the subsequent reviews of the account failed to reveal these letters absent some error in Bell's record keeping procedures. Regardless, errors by Bell in record keeping cannot be construed against the subscriber or used to justify mistakes by Bell's employees. Bell retains exclusive control over their record keeping procedures. They necessarily must bear the burden and suffer the consequences associated with any mistake or errors made by their employees, regardless of whether such mistakes are caused by simple negligence or employee incompetence.
From what we have said, we ultimately are led to conclude that Bell terminated Mrs. Epps' service wrongfully. Their actions were neither authorized by the provisions of the tariff nor excused by the mistake of their employees. On the other hand, Mrs. Epps had complied with the terms of the subscribers' tariff and with demands of South Central Bell. She was entitled to continued services once she paid her bill in full prior to the due date. As such, Bell's actions resulted in a breach of the subscribers' tariff.

3.

IS THIS CASE APPROPRIATE FOR PUNITIVE DAMAGES?
As a general rule, exemplary or punitive damages are not ordinarily recoverable in actions for breach of contract. However, in Progressive Casualty Ins. Co. v. Keyes, 317 So.2d 396 (Miss. 1975), we recognized that:
(b) Punitive damages are not recoverable for breach of contract unless such breach is attended by intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort. (Citations omitted).
317 So.2d at 398.
However, there is no right to an award of punitive damages and such damages are to be awarded only in extreme cases. Gardner v. Jones, 464 So.2d 1144, 1148 (Miss. 1985); Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983). Accordingly, we have repeatedly held:
In order to warrant the recovery of punitive damages, there must enter into the *893 injuries some element of aggression or some coloring of insult, malice, or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule.
Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 150-51, 141 So.2d 226, 233 (1962); See also, Fedders Corp. v. Boatright, 493 So.2d 301, 311 (Miss. 1986) (reaffirming Fowler); Bankers Life & Cas. Co. v. Crenshaw, 483 So.2d 254, 269 (Miss. 1985) (same). Furthermore, any plaintiff seeking to recover punitive or special damages carries a heavy burden. Cf. Blue Cross & Blue Shield of Miss., Inc. v. Campbell, 466 So.2d 833, 842 (Miss. 1984) (plaintiff asking for punitive damages in "bad faith" case has heavy burden).
With regard to punitive damages in alleged wrongful disconnection cases, our early decisions recognize that such damages are ordinarily not recoverable. However, when the disconnection can be characterized as malicious, fraudulent, oppressive, or a willful wrong evincing a disregard for the rights of the subscriber, we have held that such damages may be appropriate. Cumberland Telephone Co. v. Allen, 89 Miss. 832, 42 So. 666 (1907); Cumberland Telegraph & Tel. Co. v. Hobart, 89 Miss. 252, 42 So. 349 (1906); Cumberland Telegraph & Tel. Co. v. Baker, 85 Miss. 486, 37 So. 1012 (1905). These cases follow the general rule that we apply today with regard to the availability of punitive damages in any case.
Of course, the trial judge initially determines whether to submit the issue of punitive damages to the jury. He is required to review all of the evidence presented and determine whether the facts of the case and the conduct of the defendant was such that "the jury should be called upon to decide the justification and amount of punitive damages... ." Blue Cross, 466 So.2d at 842. However, such a decision cannot come from precise formula, but rather must come from the trial judge's life experience. Fedders Corp. v. Boatright, 493 So.2d at 311. Nevertheless, we will not hesitate to reverse the trial judge's decision where the facts of a particular case do not warrant instructing the jury as to the availability of punitive damages. See Fedders Corp. v. Boatright, 493 So.2d 301 (Miss. 1986), (trial judge's decision to instruct jury on punitive damages reversed); State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242 (Miss. 1985), (same); Consolidated Am. Life Ins. Co. v. Toche, 410 So.2d 1303 (Miss. 1982), (same).
Turning our attention back to this case again, we find that the facts simply do not justify submitting an issue of punitive damages to the jury. Certainly, Bell's employees wrongfully terminated Mrs. Epps' telephone services. In doing so, they erroneously relied on faulty records regarding the account. However, their actions are more the product of oversight, inadvertence, or incompetence rather than the product of gross, callous or wanton conduct manifesting a reckless indifference to the consequences of their act or the rights of their subscribers. See State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242, 250 (Miss. 1985). There is no evidence to indicate that Bell's employees acted maliciously or with some deliberate design to cause Mrs. Epps harm. Further we cannot say that Bell's misconduct constituted gross negligence so as to bring this case out of the ordinary rule and warrant submitting the issue of punitive damages to the jury.
We pause momentarily to voice our concern over Bell's inept handling of this matter. Mrs. Epps was an elderly subscriber living alone in a rural community. Her telephone was more a necessity than a luxury. Yet, either as the result of miscommunication between Bell's employees or because of inadequate record keeping, her telephone was terminated. We find this to be deplorable in light of the fact that Bell is equipped with modern computer systems designed to provide a complete history of any account easily accessible at the simple touch of a finger. Of course, we recognize that Bell's volume of business per day exceeds that of most other large corporations. Inevitably, employee errors will occur. Nevertheless thorough employee training and other measures of quality control *894 would help to alleviate and possibly prevent similar occurrences in the future.
Further, we are particularly concerned with the alleged statements made by Bell's agent, Santucci. If, in fact, such statements were made, they are highly inappropriate in a business context. South Central Bell derives its livelihood from the general public. They in turn should treat their customers with the utmost respect and attempt to provide them with the most efficient service possible. Nevertheless, the alleged statements were not made to Mrs. Epps personally. Further, Bell's conduct when directly dealing with Mrs. Epps falls short of being rude, insulting, or oppressive as is required in order to justify the imposition of punitive damages. See Critz v. Southern Bell T. & T. Co., 178 Miss. 323, 172 So. 510 (1937).
In conclusion, we find that this was not a punitive damage case. There is no evidence to indicate that Bell was engaged in any deceptive or fraudulent practices. Nor can we say that their breach of the subscribers' contract was attended by such gross negligence or willful wrong so as to constitute an independent tort necessary to impose punitive damages. Although we are convinced that the disconnection was a result of employee incompetence, incompetence alone does not meet our criteria for the imposition of punitive damages. As such, we find that the trial judge erred in denying the defendant's request for peremptory instruction on punitive damages and erred in submitting the issue of punitive damages to the jury.

IV.

WAS THE AWARD OF COMPENSATORY DAMAGES GROSSLY EXCESSIVE?
Under this assignment of error, South Central Bell contends that the jury's verdict of $75,000.00 compensatory damages was grossly excessive and should be set aside by this Court. Bell argues that Mrs. Epps sustained very little medical expenses, no future medical expenses, and no permanent injuries. As such, they contend that the jury's verdict was against the overwhelming weight of the evidence and a product of bias, passion and prejudice. We do not agree.
As a general rule, the measure of compensatory damages for breach of a telephone service contract is the amount which will compensate the injured subscriber for all losses and damages sustained as a direct or approximate consequence of the breach of that contract. See 86 C.J.S. Telegraphs, Telephones, Radio & Television, § 273 at 286-287 (1954). Additionally, we have held that where telephone services are wrongfully disconnected, the subscriber is entitled to recover actual damages as well as damages occasioned by the inconvenience and the annoyance caused by the deprivation of services. Cumberland Telegraph & Tel. Co. v. Hobart, 89 Miss. 252, 261-263, 42 So. 349, 350-51 (1906). However, damages for physical pain and suffering or mental pain and suffering are generally not recoverable absent a showing that the telephone company had knowledge of some special circumstances surrounding the subscriber's account which could cause such damages to occur. 86 C.J.S. at 286.
Reviewing the record at hand, we find that South Central Bell was aware of special circumstances surrounding Mrs. Epps' account. When Mrs. Epps applied for reconnection of her services, Bell's employees were informed of her previous illness. Further, Bell's employees knew that Epps was an elderly subscriber residing in a rural community and that she needed and relied on her phone in order to remain at her home. Under these facts, we think that it would be reasonably foreseeable that the wrongful termination of Mrs. Epps' services could cause her to suffer both mental anguish and physical pain and suffering, especially where the services were terminated without further notice and in such an abrupt manner.
Additionally, we find that there was sufficient evidence to justify the jury's award of compensatory damages. Mrs. Epps was admitted to the hospital shortly after her telephone was disconnected. While there, she was treated for a variety of symptoms, *895 including acute anxiety, headaches, nervousness, and blackouts. Further, Mrs. Epps developed a condition of involuntary voiding of her urine while she was hospitalized and continued to suffer from that condition after she was released from the hospital. There can be no question that she also suffered extreme mental anguish due to the incident, which undoubtedly aggravated her previous health problems. These injuries, both mental and physical, were a direct and proximate result of the breach of the subscribers' contract.
In City of Jackson v. Locklar, 431 So.2d 475 (Miss. 1983), we stated that when reviewing the verdict of a jury, we will consider the evidence in a light most favorable to the plaintiff, together with all reasonable inferences that can be drawn therefrom. Locklar, 431 So.2d at 478, 481. Further, we have held that when an issue of damages is properly before a jury, their verdict will not be vacated or reduced unless it is so out of line in light of the evidence so as to shock the conscience of the court. Anderson v. Jaeger, 317 So.2d 902, 907 (Miss. 1975). The measure of damages in cases of this nature are necessarily difficult to ascertain. They include a combination of both damages normally associated with personal injury and damages normally associated with breach of contract. The jury of course is required to look at all the alleged injuries to determine the extent of the damages. From our review of the record, it is clear that Mrs. Epps was hospitalized, experienced mental pain and suffering, and continued to suffer the effects of the incidents long after her release from the hospital. We find that the jury was reasonable in its assessments of damages and that their verdict is neither against the overwhelming weight of the evidence nor the product of bias, passion or prejudice. Accordingly, we affirm the jury's verdict of compensatory damages and find South Central Bell's assignments of error on this issue to be without merit.
Finally, we note that the remaining assignments of error are simply part of the issues we resolve today. As such, we need not address those assignments of error specifically. For the reasons stated, we reverse the award of punitive damages and affirm the award of compensatory damages.
THE AWARD OF COMPENSATORY DAMAGES IS HEREBY AFFIRMED; THE AWARD OF PUNITIVE DAMAGES IS HEREBY REVERSED AND RENDERED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., DAN M. LEE, PRATHER, ROBERTSON, ANDERSON and GRIFFIN, JJ., concur.