# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-00774-SCT

*WALTER GRIFFITH, JR., COMMERCE AND*
*INDUSTRY INSURANCE COMPANY AND*
*BOMAC ELECTRIC, INC.*

*v.*

*ENTERGY MISSISSIPPI, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/22/2014 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN, JR. |
| TRIAL COURT ATTORNEYS: | CHARLES EDWIN ROSS |
| | JAMES EARL GRAVES, III |
| | DAVID LENOIR CARNEY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WAYNE E. FERRELL, JR. |
| | ADRIENNE P. PARKER |
| ATTORNEYS FOR APPELLEE: | JAMES E. GRAVES, III |
| | CHARLES E. ROSS |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 09/01/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND BEAM, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     Walter Griffith, Jr. was critically injured while attempting to attach a ten-foot piece

of metal conduit to an electrical pole owned by Entergy Mississippi, Inc. ("Entergy").

Griffith later filed a complaint against Entergy, alleging grossly negligent and willful conduct

and requesting compensatory and punitive damages. The trial judge ultimately granted Entergy's motion for summary judgment, and Griffith now appeals to this Court. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Griffith is a licensed, master electrician—the highest credential attainable for professionals in the trade—with roughly thirty years of experience. In September 2005, Griffith was employed by BOMAC Electric, a subcontractor hired to provide electrical service to a nonresidential/commercial building owned by Kelly Dabbs Realty in Ridgeland, Mississippi.

¶3. Knowing that neither Griffith nor his coworker, Aubrey Wallace, was qualified to work on high-voltage lines,[1] Bryan Tompkins, the president of BOMAC Electric (and Griffith's direct supervisor), testified via deposition that he telephoned Keith Mallett, an Entergy service supervisor. Tompkins requested that an Entergy electrician install the necessary conduit on its pole, so that Griffith and Wallace could run a secondary wire from the Kelly Dabbs building up the pole to the transformer.

¶4. But Mallett declined Tompkins's request, informing Tompkins that—because the installation was nonresidential—BOMAC and its employees were responsible for installing the conduit and the service line to the pole, pursuant to the terms of its service policy.

---

[1]As a master electrician, Griffith was qualified to work on and around energized, low voltage electrical equipment, defined by Mississippi Code Section 45-15-1 as carrying 600 volts or less "between conductors or from any conductor to [the] ground." Miss. Code Ann. § 45-15-1 (Rev. 2015). Although he's not trained to *work on* high voltage equipment, Griffith's license ensures he is trained and qualified to *recognize* high voltage (exceeding 600 volts) equipment and to appreciate its danger when working on or near such lines.

2

Mallett then instructed Tompkins that BOMAC's employees were to stay at least three feet below the transformer while performing their work to ensure that they were always more than ten feet from the nearest high-voltage line at the top of the pole. Tompkins relayed this instruction to both Griffith and Wallace.

¶5.     On September 14, 2005, Griffith and Wallace got into a bucket truck, while a third BOMAC employee stood at its base as a "spotter" to ensure no traffic approached the lift and that the electricians maintained a safe distance from the high voltage wires.  When Wallace entered the bucket, he laid a ten-foot piece of conduit across the rail on the top of the lift, between his body and the controls.  With his back to the high voltage lines, Wallace began to operate the lift.  At the same moment, the employee acting as a spotter on the ground became distracted and failed to warn his coworkers that they were nearing the high-voltage electrical lines.  Griffith, however, recognized that the lift was inching too close to the high-voltage lines, and he mentioned to Wallace the proximity of the lift to the power line.

¶6.     Wallace testified via deposition that, once the two were in the air, Griffith assisted in directing his navigation of the lift while handling the secondary wire.  Wallace then flipped the ten-foot piece of conduit vertically, inside the bucket, where it made contact with one of the high-voltage lines attached to the cross arm of the Entergy pole, immediately causing both Griffith and Wallace to be thrown to the floor of the bucket and to sustain severe injuries.

¶7.     In September 2007, Griffith filed a complaint against Entergy, BOMAC, Tompkins and Tompkins Electric Co., Inc.[2]  Griffith alleged that Entergy was grossly and willfully negligent, and that it had a nondelegable duty to "send a crew to locations where individuals are operating near an electrical transformer or electrical power lines."  Griffith also alleged that Entergy was grossly negligent when it "allow[ed the] electrical lines to remain energized" and when it failed to send a crew, or to supervise the operations, or to properly instruct BOMAC employees.

¶8.     After a period of discovery, Entergy moved for summary judgment.  Entergy argued that Griffith had "failed to establish an essential element of any negligence claim, namely that Entergy had a duty to perform any of the acts he alleges it should have performed."  Specifically, Entergy argued that it had no duty to perform the work at issue nor to supervise Griffith's work.  Entergy argued further that it had no duty to de-energize the lines because Griffith undisputedly had failed to comply with the statutory requirement[3] that he notify

---

[2]All defendants other than Entergy subsequently were dismissed and are not parties to this appeal.

[3]Mississippi Code Section 45-15-3(b) states that "No person shall, individually or through an agent or employee, operate or bring any mechanical equipment or hoisting equipment or any other equipment or part of any tool or material within ten (10) feet of any high voltage overhead line."  Miss. Code Ann. § 45-15-3(b) (Rev. 2015).

> And Section 45-15-9 states in pertinent part that "[i]f any person desires to carry on any function, activity, work or operation in closer proximity to any high voltage overhead line than permitted by this chapter, the person responsible for performing the work shall promptly notify the electric utility operating the high voltage overhead line, in writing, on a form to be provided by such electric utility, and shall not perform the work until mutually

4

Entergy that he would be working within ten feet of high-voltage lines. In fact, noted Entergy, "it is undisputed that [Griffith] knew he was to stay at least [ten feet] away."

¶9. Griffith responded and attached an affidavit from his expert, professional engineer Donald W. Zipse.[4] Zipse provided several reasons why he viewed Entergy's actions as "grossly negligent." Griffith also argued in his response that Entergy had violated its own *Customer Installation Standards for Electric Service* (the "Manual"), which said that Entergy would "install any conduits and conductors to be attached to its poles." Griffith argued further that Entergy, as a provider of electricity, has the "highest duty of care," and that it should have anticipated and guarded against the type of injuries that Griffith suffered.

¶10. Entergy then filed a motion to strike portions of Zipse's affidavit. Entergy argued that Zipse's affidavit "offer[ed] several opinions that were not previously disclosed even in the late expert designation that this Court allowed [Griffith] to provide two months after his expert designation deadline." Entergy argued that Zipse's "new liability theories" were untimely, and that Zipse's theory about "a neutral wire connected to the pole below the transformer" should be struck as unreliable under Mississippi Rule of Evidence 702.

---

satisfactory arrangements have been made between such electric utility and the person or business entity responsible for performing the work, to deter contact with the high voltage overhead lines . . . "

Miss. Code Ann. § 45-15-9(1) (Rev. 2015).

[4] This affidavit is later referred to as Zipse's "second affidavit" or "second designation," as it was the second report Zipse provided as part of his overall expert opinion.

5

¶11.    After a hearing, the trial judge entered an order dated April 9, 2012, disposing of several outstanding motions, including portions of Entergy's motions to strike and for summary judgment.  As for Entergy's motion to strike portions of Zipse's affidavit for being untimely, the trial judge noted

> Entergy argues the following opinions were for the first time disclosed in [Zipse's] affidavit:  (1) a neutral wire located below the transformer was energized – before the affidavit[,] plaintiff only contended energized lines above the transformer posed a risk, (2) that plaintiff's perception of the overhead lines was distorted and that Entergy should have had some type of device to warn of their presence, (3) Entergy violated NESC[5] and (4) Entergy was negligent for failing to train or supervise plaintiff.

After examining Griffith's expert designations, the trial judge granted Entergy's motion to strike Zipse's affidavit testimony regarding the three "new liability theories."[6]

¶12.    Concerning Entergy's argument that Zipse's "neutral wire" theory was unreliable under Rule 702, the trial judge found:

> Zipse's second affidavit discusses the neutral conductor which would have been below the transformer . . . The Court agrees with Entergy's causation argument regarding the neutral conductor, [P]laintiff was harmed by the high voltage lines above the transformer. Pages 7-9 (the end) of the affidavit revolve around "semi-insulated cable."  Specifically, the affidavit states semi-insulated cable would have been a preventative measure to prevent the, "accident resulting from bare energized overhead conductors.["]  After having carefully considered the issue, having reviewed the complaint and designation,

---

[5]National Electrical Safety Code.

[6]As for the argument about Entergy's alleged failure to train and/or supervise Griffith at the Dabbs site, the court held that "Entergy did not have a duty to be present and cannot be held potentially liable for failure to do so."

6

the Court is not prepared to strike pages 7-9; however, the defense may raise a **Daubert**[7] challenge either at or immediately preceding trial.

¶13.   As for Entergy's motion for summary judgment, the trial judge told the parties that they should

> read this order carefully to see which theories this Court, through various prior rulings in this order, has excluded. Again, the Court agrees with Entergy's argument, "any alleged failure to warn [plaintiff] about the danger of the neutral wire was not a proximate cause of the accident." The Court has also excluded several of Plaintiff's theories as being untimely: (1) any alleged violation of the NESC standards, (2) Entergy's alleged failure to install devices that would have warned plaintiff of the presence of overhead lines, and (3) that a neutral wire located below the transformer was energized.
>
> However, there still remains a theory the Court has not stricken, which is the alleged negligence of Entergy regarding the lines above the transformer, and the alleged failure to use semi-insulated cable – again such expert testimony may be subject to **Daubert** later.

Finally, concerning Griffith's claim that Entergy had violated its own installation standards, the trial judge found that

> Entergy's Customer Installation Standards [the "Manual"] specifically warned local rules shall govern, importantly, regardless of the intent express or implied of the Standards. Therefore regardless of the implied or express intent of the Standards, the PSC's Policy for the Extension of Underground Electric Distribution, specifically the section regarding non-residential underground service lines, controls and provides it was the duty of the customer and not Entergy to install the line and conduit. Therefore, Entergy did not have a duty to be present and cannot be held potentially liable for failure to do so. The Court would further note the PSC policy at issue specifically provides [for] metal [conduit] and not PVC.

---

[7]**Daubert v. Merrell Dow Pharms., Inc.,** 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

¶14.    Thus, following the trial court's April 9, 2012, Order on the outstanding motions, one issue remained:  whether semi-insulated cable (i.e., tree wire) would have prevented the "accident resulting from bare overhead conductors."  In other words, was Entergy negligent when it used "bare conductors" (i.e., noninsulated wire) to construct its overhead lines, instead of "semi-insulated conductors" (i.e., tree wire)?  However, as noted above, the trial judge provided that Entergy "may raise a **Daubert** challenge [on this issue] either at or immediately preceding trial."  Following the court's suggestion, Entergy supplemented its existing expert designations, filed a renewed motion to strike Zipse's tree-wire testimony under **Daubert**, and filed a renewed motion for summary judgment.

¶15.    Entergy argued in its renewed motion to strike that Zipse's opinion regarding Entergy's failure to use tree wire in this location—where there were no problems with trees or foliage—was not generally accepted in the electrical field.  Entergy argued further that Zipse's opinion that tree wire should have been used as a safety device to protect against contact injuries also was contrary to the accepted science in the electrical field.  Entergy then stated that Zipse's "hypothesis that momentary contact with tree wire is safe and/or would not result in injuries" was "pure, unsupported speculation."

¶16.    After a hearing, the trial judge denied Entergy's renewed motions to strike and for summary judgment, stating:

> The Court having considered Entergy's Motion for Summary Judgment finds that while it may be a close issue, the motion should be denied. The Court . . . . finds the industry recognizes that use of semi-insulated cable, when in good condition, very well could prevent injury due to momentary contact; however, it is not the industry standard to use semi-insulated cable, for various reasons, outside areas of dense foliage.

8

¶17.   Entergy then asked the trial judge to reconsider his ruling on its renewed motion for summary judgment.   Entergy argued that "by virtue of its finding that tree wire is not required by industry standards in situations like this where there [are] no problem[s] with dense foliage, [the court] has found that Entergy did not have a duty to install tree wire."  As such, continued Entergy, the trial judge's order was "internally inconsistent."  Entergy also argued that Griffith had failed to establish causation, pointing out that "neither [Griffith] nor Zipse presented any testimony or evidence whatsoever that, if tree wire had been used at the time the line was constructed . . . . [the] wire would have been in such 'good condition' at the time of [Griffith's] injury as to have more probably than not prevented" Griffith's injuries (emphasis in original).

¶18.   At a status hearing two weeks before trial, the trial judge informed counsel that he was "seriously considering" Entergy's motion for reconsideration, and that he needed a response before the scheduled hearing on the motion. At that point, the following exchange occurred:

| | |
|---|---|
| Counsel for Griffith: | I think that may be the best thing is to go ahead and grant their motion. Let's go to the supreme court. Our case is gutted by the – by exclusion of the Entergy book,[8] so, I mean, that may be the best way to get this thing resolved. |
| Court: | Have you got an order? |
| Counsel for Entergy: | I'll have you one in an hour, Your Honor. |
| Court: | Sounds good. Let's do that. |

---

[8]The "Entergy Book" is the Manual referred to earlier in this opinion. In its April 9, 2012, order, the court ruled the Mississippi Public Service Commission service policy concerning a utility provider's duty to its customer superceded such internal manuals.

9

. . . .

| | |
|---|---|
| Counsel for Griffith: | Do I understand you're granting total summary judgment? |
| Court: | Isn't that what you just suggested where you could take it on up? |
| Counsel for Griffith: | Well. Your Honor, I – yes. sir. |
| Court: | Okay. That's what we're doing. |

¶19.   In his final order, the trial judge noted first that he did not "necessarily agree" with Entergy's argument that industry standards did not require the use of tree wire,  because "an industry standard may not be conclusive regarding the issue of negligence as the industry standard itself may be subpar."  But the trial judge ultimately *was* convinced by Entergy's causation argument in its motion to reconsider.  Quoting Entergy's motion in his order, the judge wrote:

> [N]either Plaintiff nor Zipse presented any testimony or evidence whatsoever that, if tree wire had been used at the time the line was constructed (which is the relevant time period for Plaintiff's negligent construction claim), the wire would have been in such "good condition" at the time of Plaintiff's injury as to have more probably than not prevented the Plaintiff's injuries. This failure is fatal to Plaintiff's claim.

Based on this argument, the trial judge granted Entergy's motion to reconsider and entered judgment in its favor.

¶20.   Griffith now appeals to this Court and raises three issues which we restate for clarity:

> (1) Did the circuit court err when it found that Entergy had no duty to install the conduit or to be present at the job site?

> (2) Did the circuit court err when it excluded Zipse's opinion regarding the neutral wire located below the transformer?

10

(3) Does a genuine issue of material fact remain regarding whether Entergy's failure to use tree wire proximately caused Griffith's injuries?

## LAW AND ANALYSIS

**I.      The trial judge did not err when he found that Entergy had no duty to install the conduit or be present at the job site.**

¶21.   "The existence *vel non* of a legal duty is a question of law," and the issue of "[w]hether a defendant breached its duty to the plaintiff is a question of fact." *Eli Inv. v. Silver Slipper Casino Venture, LLC*, 118 So. 3d 151, 154 (Miss. 2013).  "To prevail in any type of negligence action, a plaintiff must first prove the existence of a duty."  *Enter. Leasing Co. S. Cent. v. Bardin*, 8 So. 3d 866, 868 (Miss. 2009) (*citing Laurel Yamaha, Inc. v. Freeman*, 956 So. 2d 897, 904 (Miss. 2007)). Once the plaintiff establishes a duty was owed, "[t]he elements of breach and proximate cause must be established by the plaintiff with supporting evidence." *Todd v. First Baptist Church of West Point,* 993 So. 2d 827, 829 (Miss. 2008) (citations omitted). "Duty and breach of duty, which both involve forseeability, are essential to finding negligence and must be demonstrated first." *Duckworth v. Warren*, 10 So. 3d 433, 440 (Miss. 2009) (*quoting Simpson v. Boyd,* 880 So. 2d 1047, 1050 (Miss. 2004)).

¶22.   In his complaint, Griffith alleged that Entergy breached a nondelegable duty to send crew members to locations where individuals are operating near electrical transformers or power lines and to supervise and instruct all activity near the power lines and equipment owned by its company.  Griffith argued that this nondelegable duty includes the duty to turn off electrical current, to ensure that safe practices are followed, and to ensure that employees

11

of contracting companies are not operating near electrical transformers and/or electrical power lines.

¶23. According to Griffith, these alleged duties arise from a policy outlined in Entergy's Manual, which says, in pertinent part:

**8.7.3 Underground Secondary Service from Overhead Systems**

Underground secondary service from an overhead distribution system *may be provided to non-residential Customers. The Company will install any conduits and conductors to be attached to its poles.*

(Emphasis added.) But importantly, the Manual also anticipates conflicts with state and federal law. Section 2.2 of the Manual says:

**2.2 Code Requirements**

The data contained herein is intended to *conform with and be supplementary to recognized codes or rules and regulations of the authority having jurisdiction over the installation. In all cases, those codes or rules and regulations shall govern*, regardless of possible conflict in the expressed or implied meaning of the contents of this book.

(Emphasis added.)

¶24. Entergy argues that the Manual's intent is clear: when a local policy, ordinance, code or regulation conflicts with Entergy policy or requires a specific action from its employees, that policy will govern a crew's responsibilities and on-site activities. And here, the Mississippi Public Service Commission's (MPSC) service policy[9] mandates that

---

[9]MPSC's "Policy for the Extension of Underground Electrical Distribution Facilities" was filed July 2, 1986, and became effective August 14, 1986.

Installation of Facilities for Secondary Voltages – *The Customer [BOMAC] will install, own, operate, and maintain the service line including the required rigid metal conduit up the Company's [Entergy's] pole.*

(Emphasis added.) So, argues Entergy, the MPSC policy provision controls here, making BOMAC responsible for installing the conduit.

¶25.    We agree and find that the MPSC policy controls here, per the Manual's own language.  As such, the trial judge did not err when he found that "it was the duty of the customer and not Entergy to install the line and conduit," and that "Entergy did not have a duty to be present and cannot be held potentially liable for failure to do so."  Nor did he err when he granted summary judgment on this issue, because the Manual was the sole basis for Griffith's general negligence claims.[10]

**II.    The trial judge did not err when he struck Zipse's neutral wire opinion.**

¶26.    As mentioned, in his April 9 Order, the trial judge struck several of Zipse's opinions. Griffith argues that Zipse's opinion on the neutral wire/conductor was both relevant and timely and should not have been stricken.  He argues that,"although sometimes described as 'neutral,' such conductors are energized and carry current to the extent that when a person who simultaneously touches a neutral conductor and the earth, electric current is allowed to

---

[10]Griffith argues that the standards set forth by the MPSC are nothing more than a "tariff," and as such, do not amount to a code, rule, or regulation.  We disagree.  In ***South Central Bell v. Epps***, 509 So. 2d 886, 891 (Miss. 1987) we wrote that, "[b]y statute, [public utilities] still retain the right to make rules and regulations concerning the operation of their business. However, these rules, *or tariffs*, must be submitted and approved by the [Mississippi] Public Service Commission before they are *valid and binding on the subscribers*."  (Emphasis added.)

13

flow through the person's body." Griffith maintains that Entergy's failure to supervise or disconnect the current from these wires, along with Mallett's insistence on the use of metal conduit (a known conductor of electricity), establish a genuine issue of material fact as to whether Entergy breached its duty to ensure Griffith's safety and caused his injuries as a result.

¶27. Griffith also argues that Zipse's opinion was timely submitted. Citing the expert designation submitted on December 27, 2011, Griffith asserts that he provided Entergy with enough detail to put the defense on notice that Zipse would testify "as an electrical expert generally and . . . concerning the negligent conduct of Entergy." Griffith asserts that the failure to mention the location of the neutral wire in the first designation is irrelevant, because Zipse's first affidavit referred to a "bare overhead conductor attached to the transformer" which put Entergy on notice, fully complying with Mississippi Rule of Civil Procedure 26(b)(4)(A)(i).[11]

¶28. Entergy counters that (1) prior to the second designation, Griffith had alleged only that the high voltage lines above the transformer—not neutral conductors below the transformer—posed a danger to him, and (2) it is undisputed that the only line Wallace

---

[11] "A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Miss. R. Civ. P. 26(b)(4)(A)(i).

14

contacted was a high voltage line, *above the transformer*, at the top of the pole. Thus, argues Entergy, the designation was both untimely and irrelevant.

¶29. "Our well-established standard of review for the trial court's admission or suppression of evidence, including expert testimony, is abuse of discretion." *Tunica County v. Matthews,* 926 So. 2d 209, 212 (Miss.2006) (citing *Miss. Transp. Comm'n v. McLemore,* 863 So. 2d 31, 34 (Miss. 2003)). "A trial judge's determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion." *Worthy v. McNair,* 37 So. 3d 609, 614 n. 3 (Miss. 2010) (quoting *Sheffield v. Goodwin,* 740 So. 2d 854, 856 (Miss.1999)).

¶30. Expert testimony should be admitted only if it satisfies M.R.E. 702 through "scientific, technical, or other specialized knowledge [to] assist the trier of fact to understand the evidence or to determine a fact in issue." M.R.E. 702. If that witness is "qualified as an expert by knowledge, skill, experience, training, or education," then he or she may testify, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* In other words, the expert witness must be qualified to render the opinion, and the testimony must be relevant and reliable. *Watts v. Radiator Specialty Co.,* 990 So.2d 143, 146 (Miss. 2008) (citing *McLemore,* 863 So. 2d at 35). *See also Rebelwood Apartments RP, LP v. English,* 48 So. 3d 483, 494 (Miss. 2010)("expert's qualification and reliability of testimony are separate questions").

¶31.   To be relevant, evidence must have a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. M.R.E. 401.  Here, it is undisputed that Griffith was harmed by the high-voltage lines above the transformer.  Indeed, the facts are simple.  Wallace was holding a ten-foot piece of conduit.  Wallace flipped it around vertically.  The conduit hit the bare overhead conductor which was above the transformer.  This contact caused a "fire ball," injuring both Wallace and Griffith.  At no point did either electrician come in contact with the neutral wire.

¶32.   In short, the cause of the accident *may* have been Griffith's instruction to turn the conduit around so they could install it properly or Wallace's decision to flip the conduit vertically, but it is undisputed that the injury was not caused by the presence of an unrelated, neutral wire.  As such, the trial judge did not err when he excluded Zipse's neutral-wire theory as irrelevant.

¶33.   And while irrelevance alone was a sufficient basis to exclude Zipse's opinion, we also agree with the trial court that it was not timely disclosed.  This Court said in *Nichols v. Tubb* said that Mississippi Rule of Civil Procedure 26(b)(4)

> requires disclosure of "facts known and opinions held by experts," and as to each proposed testifying expert, to state "the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion."  This means that the *substance* of *every* fact and *every* opinion which supports or defends the party's claim or defense must be disclosed and set forth in meaningful information which will enable the opposing side to meet it at trial.
>
> Not only this, the "grounds" or basis of each opinion must be disclosed. If the expert's opinion is based upon his own experience, the answer should so state,

16

and if based upon some other ground, the precise source should be likewise disclosed.

*Nichols v. Tubb*, 609 So. 2d 377, 384 (Miss. 1992) (emphasis in original).

¶34.    Griffith argues that Zipse's testimony was properly disclosed in his first expert designation, in which he submitted that Zipse would testify, "as an electrical expert generally and . . . concerning the negligent conduct of Entergy on or about September 13, 2005." Further, Zipse was to testify that Entergy's contradictory rules/requirements prevented Griffith "from avoiding contact with Entergy's energized bare overhead conductors" which eventually led to his "making contact with Entergy's energized overhead bare conductors."

¶35.    But we agree with the trial judge and find that this language was insufficient to put Entergy on notice that Zipse would testify regarding the neutral-wire theory presented in his second affidavit. Nowhere in the first designation did Zipse mention neutral wires or conductors below the transformer. Stated differently, Griffith did not "set forth meaningful information" about the tree-wire theory that would allow Entergy to meet it at trial. *Id*. Accordingly, we find also that the neutral-wire theory was not timely disclosed.[12]

---

[12] We note specifically the discovery deadline set by the trial court, October 28, 2011; the date Griffith's expert designation was filed, December 27, 2011; the date Entergy filed its motion for summary judgment, January 25, 2012; and finally, the date Griffith filed Zipse's second affidavit, February 21, 2012. So, not only was the second affidavit submitted nearly four months after the scheduled deadline for expert designations, but it was provided as part of a responsive pleading one month after the close of discovery

17

### III. The trial judge did not err in granting summary judgment on Griffith's tree-wire theory.

¶36. After the court issued its April 9 Order, the only issue remaining was whether Entergy's use of semi-insulated cable (tree wire) would have prevented the "accident resulting from bare energized overhead conductors." As with his other theories, Griffith supports his tree-wire theory via the multiple affidavits submitted by Zipse. In his second affidavit, Zipse opined that with

> such semi-insulation, an individual can make contact with semi-insulated cable momentarily, with the high probability of no resulting harm to the individual. One could make momentary contact with semi-insulated cable without any harm as long as the insulation is not compromised. In the instant case, it would be expected that the insulation would not have been broken and would have maintained the ability to offer momentary protection against any contact with the energized conductor(s).

¶37. Zipse went on to say that, if tree wire had been used, there would have been "a very significant likelihood that Mr. Griffith would not have sustained injuries to his body generally as a result of the severe electrical shock . . . ." Zipse also opined that

> One should err on the side of safety. The use of electrical conductors such as semi-insulated electrical conductors are less costly to install than fully insulated and rated electrical conductors and semi-insulated electrical cable possesses *likely possibility* that Mr. Griffith would not have been injured when the metallic conduit came in contact with a semi-insulated electrical conductor[.]

(Emphasis added.)

¶38. We note Zipse's use of words like "could," "should," and "possibility" throughout his affidavits. That type of testimony simply is not sufficient to create a genuine issue of material fact under Mississippi law. This Court has stated that "'verdicts are to be founded

18

upon probabilities according to common knowledge, common experience, and common sense, and not upon possibilities; and a verdict cannot convert a possibility or any number of possibilities into a probability.'" *White v. Yellow Freight Sys., Inc.*, 905 So. 2d 506, 512 (Miss. 2004) (quoting *Elsworth v. Glindmeyer*, 234 So. 2d 312, 319 (Miss. 1970)).

¶39.    Here, Zipse provided no evidence or data to support the theory that the use of semi-insulated or insulated conductors more likely than not would have prevented Griffith's injuries, as opposed to bare overhead conductors. Further, while Zipse continuously opined that the use of tree wire provides a safeguard to people who may come in contact with it, at no point did he opine that Entergy's compliance with the industry standard of insulating bare conductors through air, space, and distance put Griffith in danger. Nor did he provide evidence that the use of tree wire has been proven superior to the "air, space, and distance" industry standard in areas where dense foliage is not present.

¶40.    Additionally, the Dagenhart article[13] indicates that the tree wire's protection value remains intact in normal-to-dry conditions, though the "addition of moisture" or "very severe (and evident) conditions of moisture" increase the likelihood that current might leak through the protection. It further explains that "[w]hile the probability of electrocution due to accidental contact is small if the covering remains intact, should a fault occur at the point of

---

[13] This article was co-authored by Entergy's lead witness and was relied on heavily by Zipse for his tree-wire theory. *See* A.L. Clapp, J. B. Dagenhart, C.C. Landiner, J. W. McAuliffe, and W. A. Thue, *Safety Considerations of Aerial Systems Using Insulated and Covered Wire and Cable*, Vol. 12, No. 2, IEEE Transaction on Power Delivery, 1012-1014 (1997).

contact, electrocution, flash burns, or burns from hot debris associated with the fault are possible, even on a shielded cable."

¶41. As mentioned above, the trial court recognized that, in order to lessen injury, the tree wire must be in good condition and devoid of cracking, weathering, or moisture damage. Zipse provided no testimony regarding the effects of damaged insulated wire or the condition of insulated wire after a catastrophic event—other than the fact that it may crack, decay, or retain moisture over time—and there is simply no evidence that the wire would have maintained its protective properties.

¶42. Again, the trial judge found that

> neither [Griffith] nor Zipse presented any testimony or evidence whatsoever that, if tree wire had been used at the time the line was constructed (which is the relevant time period for Plaintiffs negligent construction claim), the wire would have been in such "good condition" at the time of Plaintiffs injury as to have <u>more probably than not</u> prevented the Plaintiffs injuries.

(Emphasis in original.) The lack of testing, evidence, and data supporting Zipse's theory was "fatal to [Griffith's] claim," and the trial judge agreed that "any opinion from Zipse that the use of tree wire would more probably than not have prevented [Griffith's] injuries is pure speculation and conjecture, which is inadmissible under MRE 702 and is insufficient to establish proximate causation." *See, e.g.*, ***Hill v. Mills***, 26 So. 3d 322, 329 (Miss. 2010) (an expert's opinions must be based on more than "subjective or unsupported speculation").

¶43. We agree, and we find that the trial judge did not err when he determined that no genuine issue of material fact remained as to Griffith's tree-wire theory.

## CONCLUSION

¶44.    For the foregoing reasons, we find that the trial judge did not err in granting Entergy's motion for summary judgment, and we therefore affirm the judgment of the Hinds County Circuit Court.

¶45.    **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.**